792 A.2d 412 (2002)
348 N.J. Super. 382
IN RE the Matter of the 1999-2000 ABBOTT
v.
BURKE IMPLEMENTING REGULATIONS, N.J.A.C. 6:19A-1.1 et seq.
Superior Court of New Jersey, Appellate Division.
Argued October 9, 2001.
Decided February 22, 2002.
*415 David G. Sciarra, Executive Director, argued the cause for appellants (Education Law Center, attorneys; Mr. Sciarra, on the brief).
Michelle Lynn Miller, Deputy Attorney General, argued the cause for respondent, Department of Education (John J. Farmer, Jr., Attorney General of New Jersey, attorney; Nancy Kaplan, Assistant Attorney General, of counsel; Ms. Miller on the brief).
Zazzali, Zazzali, Fagella & Nowak, attorneys for Amicus Curiae New Jersey Education Association (Richard A. Friedman, on the brief).
Before Judges HAVEY, COBURN and WEISSBARD. *413
*414 The opinion of the court was delivered by HAVEY, P.J.A.D.
Appellants, a group of children who attend public schools in special needs districts designated as "Abbott districts," challenge the constitutionality of regulations promulgated by the Department of Education (DOE) pursuant to the Supreme Court's directives in Abbott v. Burke, 153 N.J. 480, 710 A.2d 450 (1998) (Abbott V) and Abbott v. Burke, 163 N.J. 95, 748 A.2d 82 (2000) (Abbott VI). The challenged regulations were codified at N.J.A.C. 6:19A-1.1 to -8.1 and recodified with amendments as N.J.A.C. 6A:24-1.1 to -9.6, which are scheduled to expire in June 2005. 32 N.J.R. 1329, 1329-41 (April 17, 2000); 32 N.J.R. 2470, 2470-83 (July 3, 2000). Essentially, appellants claim that the regulations failed to codify the Court's mandates in Abbott V and Abbott VI. Prior to its decisions in Abbott V and Abbott VI, the Court had held in Abbott v. Burke, 149 N.J. 145, 152-53, 693 A.2d 417 (1997) (Abbott IV), that the Comprehensive Education Improvement and Financing Act of 1996 (CEIFA or the 1996 Act), L. 1996, c. 138, was unconstitutional as applied to school districts that served children in poor districts and that were classified as "special needs districts." The Court ordered the State to provide increased funding to the twenty-eight "Abbott" school districts, and to manage implementation of the additional funding so as to further the students' ability to achieve at the level prescribed by the Core Curriculum Content Standards (CCCS) adopted by the DOE. Id. at 224-25, 693 A.2d 417.
The Court in Abbott IV directed the Commissioner of Education (Commissioner) to conduct a comprehensive study of the needs of students in the Abbott districts, specify programs that would address those needs, determine the costs of those programs, and devise a plan for implementation. Ibid. In addition, the Commissioner was ordered to review the facilities needs of the Abbott districts and provide recommendations on addressing those concerns. Id. at 225, 693 A.2d 417. The Commissioner was to provide to the Superior Court interim progress reports and a final report. Ibid. The Court appointed Judge King of the Appellate Division, to conduct hearings on the Commissioner's report, and he issued a report and recommendation dated January 22, 1998. Abbott V, supra, 153 N.J. at 493, 710 A.2d 450. In Abbott V, the Court relied on Judge King's report to explain the remedial measures it deemed necessary "to ensure that public school children from the poorest urban communities receive the educational entitlements that the *416 Constitution guarantees them." Id. at 489, 710 A.2d 450.
The key to the Abbott reform efforts is implementation in elementary schools of a concept known as "whole-school reform." Id. at 494-502, 710 A.2d 450. Whole-school reform is a comprehensive approach that integrates reform efforts throughout a school on an institutional level, so as to affect the culture of the entire school, including instruction, curriculum, and assessment. Id. at 494, 710 A.2d 450. During the hearings conducted by Judge King, the Commissioner recommended the adoption of a version of whole-school reform known as Success for AllRoots and Wings (SFA). Id. at 494-95, 710 A.2d 450. School-based management teams (SMTs), consisting of school administrators, teachers and parents, are an essential component of the SFA model, which relies on the assumption that each of these different groups will "buy into" the program. Id. at 496-97, 710 A.2d 450. Another key aspect of whole-school reform is "zero-based budgeting" whereby a school combines all of its revenue sources and uses the entirety of its funds to implement the reform, rather than allocating certain funds to specific programs. Id. at 498, 710 A.2d 450.
The Commissioner proposed a version of the SFA that expanded "every element" of the model including, for example, a reduction in the model's recommended class sizes, an increase in the number of tutors per student, and the inclusion of substantial technology components. Id. at 497, 710 A.2d 450. In addition to the SFA model, the Commissioner proposed that a school could adopt one of four other models "if it could show convincingly that the alternative model it chose would be equally effective and efficient as SFA or that the model was already in place and operating effectively." Id. at 494, 710 A.2d 450.
Accepting evidence of the success of whole-school reform programs that encompassed SFA, the Court stated:
[W]e adopt Judge King's recommendation "that the State require the Abbott districts to adopt some version of a proven, effective whole-school design with SFA-Roots and Wings as the presumptive elementary school model." We direct that implementation proceed according to the schedule proposed by the Commissioner and that SFA contain the essential elements identified by the Commissioner. Finally, we direct the Commissioner to implement as soon as feasible a comprehensive formal evaluation program, modeled on SFA's formal evaluation precedents, to verify that SFA is being implemented successfully and is resulting in the anticipated levels of improvement in the Abbott elementary schools.
[Id. at 501-02, 710 A.2d 450 (citations omitted).]
The Court rejected appellants' contention that SFA was beyond the DOE's statutory authority and inconsistent with the Court's decision in Abbott IV. Id. at 499, 710 A.2d 450. It found that the Commissioner's "broad remedial powers" under the CEIFA provided sufficient authority for the Commissioner's actions. Id. at 499-501, 710 A.2d 450.
In addition to adopting the whole-school reform approach for elementary schools, the Court examined the aspects of whole-school reform relevant to early childhood education programs, recognizing that early childhood education was "essential" for children in Abbott districts and "an integral component of whole-school reform." Id. at 502-08, 710 A.2d 450. Specifically, the Court adopted Judge King's recommendation for the implementation of full-day kindergarten "immediately" or, as an alternative for schools unable to obtain *417 promptly sufficient space or instructors, by commencement of the September 1999 school year. Id. at 503, 710 A.2d 450. In addition, it directed the Commissioner "to exercise his power" under CEIFA "to require all Abbott districts to provide half-day pre-school for three- and four-year-olds." Id. at 508, 710 A.2d 450. The Court permitted the Commissioner to implement the pre-school programs by "authoriz[ing] cooperation with or the use of existing early childhood and day-care programs in the community." Ibid.
Although the Commissioner declined to recommend the adoption of whole-school reform for middle and high schools, he did recommend several supplemental programs that could be implemented at all levels, from elementary to high school. Id. at 508-09, 710 A.2d 450. The most significant supplemental programs involved the provision of health and social services, and increased security measures. Id. at 509-14, 710 A.2d 450. The Court recognized that the Abbott schools would have varying needs for supplemental programs. Id. at 517, 710 A.2d 450. Thus it "authorize[d]" the Commissioner to implement technology programs "at the request of individual schools or districts or as he otherwise shall direct" and "to implement alternative schools or comparable education programs." Ibid. It "direct[ed] the [C]ommissioner to authorize accountability programs, as may be deemed necessary or appropriate" and to implement school-to-work and college-transition programs in secondary schools "at the request of individual schools or districts or as the Commissioner otherwise shall require." Ibid. The Court concluded:
In respect of the other supplemental programs, we decline to order their immediate district-wide implementation, even though all such programs are sound in principle. Rather, because the needs for these programs will vary from school to school, we direct the Commissioner to provide or secure the funding necessary to implement those programs for which Abbott schools or districts make a request and are able to demonstrate a need. We reiterate that for middle and secondary schools, which will not have the benefit of whole-school reform, such supplemental programs may be necessary to ensure the educational success of their students.
[Ibid.]
The Court also recognized that disputes would arise from the administration of the public education that would be prompted by the reforms, including "the implementation, extension, or modification of existing programs, the need for additional supplemental programs, the allocation of budgeted funds, the need for additional funding, and the implementation of the standards and plans for the provision of capital improvements and related educational facilities." Id. at 526, 710 A.2d 450. The Court determined that disputes relating to those matters would be considered "controversies" under the School Laws, N.J.S.A. 18A:7A-1 to 7F-34, and established the process to be followed to resolve such controversies. Id. at 526-27, 710 A.2d 450.
The Court summarized its directions to the Commissioner as follows:
In summary, and consistent with this opinion, we determine and direct that the Commissioner implement whole-school reform; implement full-day kindergarten and a half-day pre-school program for three- and four-year olds as expeditiously as possible; implement the technology, alternative school, accountability, and school-to-work and college-transition programs; prescribe procedures and standards to enable individual schools to adopt additional or extended supplemental programs and to seek and *418 obtain the funds necessary to implement those programs for which they have demonstrated a particularized need; implement the facilities plan and timetable he proposed; secure funds to cover the complete cost of remediating identified life-cycle and infrastructure deficiencies in Abbott school buildings as well as the cost of providing the space necessary to house Abbott students adequately; and promptly initiate effective managerial responsibility over school construction, including necessary funding measures and fiscal reforms, such as may be achieved through amendment of the Educational Facilities Act.
[Id. at 527, 710 A.2d 450.]
The Court ordered the Commissioner "to promulgate regulations and guidelines that will codify the education reforms incorporated in the Court's remedial measures." Id. at 526, 710 A.2d 450.
By statutes effective June 28, 1999, the Legislature expedited the procedure for the adoption of Abbott regulations for the 1999-2000 school year, and authorized amendments to be made thereafter in accordance with the Administrative Procedure Act, N.J.S.A. 52:14B-1. N.J.S.A. 18A:7F-35. The statute provided that any regulations adopted pursuant to this procedure would expire June 30, 2000. Ibid. The Legislature also authorized the State Board of Education (Board) to adopt regulations for the 2000-2001 school year to implement the Supreme Court's directive in Abbott V. N.J.S.A. 18A:7F-36.
On September 9, 1999, after public hearings were held, the DOE adopted as N.J.A.C. Chapter 6:19A, rules for "Urban Education Reform in the Abbott Districts," to be effective on September 10, 1999, and to expire on June 30, 2000. 31 N.J.R. 2924, 2924 (Oct. 4, 1999). Generally, the regulations: (1) provided for the establishment of SMTs; (2) mandated the adoption of a DOE-approved program of whole-school reform, or an alternative program design, by all schools in the Abbott districts; (3) established school-based budgeting; (4) implemented required programs in the secondary schools; and (5) provided a format to guide the school districts in their requests for State aid, and a formula for determining a district's facilities' needs. 31 N.J.R. at 2953-64.
On November 16, 1999, appellants filed a notice of appeal challenging the regulations as arbitrary, capricious, and contrary to law.
On March 7, 2000, the Supreme Court decided a motion in aid of litigant's rights filed by appellants to enforce their rights as set forth in Abbott V. Abbott VI, supra, 163 N.J. at 100, 748 A.2d 82. Appellants claimed that the Commissioner had "repudiated his promise to provide quality preschool education for the disadvantaged school children who reside in the Abbott districts," and that "systemic failures" required the Court's intervention. Ibid. Although the Court rejected appellants' broader claim of bad faith and noncompliance by the Commissioner, it did conclude that the DOE's use of uncertified teachers in its preschool programs "violates the Abbott V requirement to establish quality preschool programs for three- and four-year old children." Id. at 100-01, 748 A.2d 82. The Court also found that "the programs that have been implemented do not conform to the proposals that were accepted by the Court." Id. at 105, 748 A.2d 82.
In response to the Court's decision in Abbott VI, the DOE readopted the N.J.A.C. 6:19A regulations with amendments, recodified as N.J.A.C. 6A:24-1.1 to -9.6, scheduled to expire in June 2005 (the "2000-2005 regulations"). 32 N.J.R. at 2470. The amendments implemented rules to ensure the quality preschool education directed by the Court in Abbott VI, *419 and established a full-day kindergarten for five-year-olds. 32 N.J.R. at 1332-36. The amended regulations, effective June 8, 2000, 32 N.J.R. at 2470, are divided into nine subchapters. Subchapter 1, "General Provisions," states the purpose and applicability of the rules, provides definitions, and establishes the assignment of School Review and Improvement Teams (SRI). N.J.A.C. 6A:24-1.1 to -1.6. Subchapter 2, "School Management Teams" (SMT), establishes SMT guidelines. N.J.A.C. 6A:24-2.1 to -2.3. Subchapter 3, "Early Childhood Education," implements a full-day kindergarten program, sets teacher-to-child ratios and class sizes, and establishes teacher credentials. N.J.A.C. 6A:24-3.1 to -3.4. Subchapter 4, "Whole School Reform" (WSR), establishes a time frame for submission by secondary schools of applications for implementation in the 2001-02 school year of WSR or alternative program and procedure for implementation of annual school-based budgets. N.J.A.C. 6A:24-4.1 to -4.5. Subchapter 5, "Supplemental Programs and Services," provides standards to determine whether a school demonstrates a particularized need for supplemental educational programs. N.J.A.C. 6A:24-5.1 and -5.2.
Subchapter 6, "Required Programs in Secondary Schools," requires that SMTs submit annually a revised plan for the implementation of required programs and identifies components of the plan. N.J.A.C. 6A:24-6.1. Subchapter 7, "District Budget and Request for Additional State Aid," sets forth considerations for submission and approval of balanced school-based budgets. N.J.A.C. 6A:24-7.1. Subchapter 8, "Facilities," requires that each district submit a long-range facilities plan, establishes several applicable definitions and standards to be used, and sets forth the Commissioner's treatment of a plan. N.J.A.C. 6A:24-8.1.[1]Subchapter 9, "Appeals," establishes an appeal procedure for an applicant aggrieved by the DOE's decision regarding an application to improve or amend an existing program, or to adopt a supplemental program, implement a required secondary program, build or renovate school facilities, or seek additional aid. N.J.A.C. 6A:24-9.1 to -9.6.
I
STANDARD OF REVIEW
Appellants first contend that we must apply a de novo standard of review to their challenge to the DOE's Abbott regulations because the appeal raises constitutional issues related to the DOE's noncompliance with its constitutionally prescribed duties and statutory requirements, and because the issues involve implementation of the Supreme Court's remedial orders entered in previous Abbott cases to effectuate a constitutional decree.
The Education Clause of the New Jersey Constitution mandates that "[t]he Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, ¶ 1. This clause provided the constitutional authority for the Court's mandate that remedial measures be implemented to ensure that the educational entitlements guaranteed by the Constitution were afforded to public school children in the poorest urban districts. Abbott V, supra, 153 N.J. at 489, 710 A.2d 450.
*420 Appellants reason that the constitutional issues addressed by the Court compel us to review these regulations de novo, "with the State bearing the burden of demonstrating compliance upon a prima facie showing of unconstitutionality." However, appellants have provided no legal support for that contention. Under well-established judicial principles, administrative regulations are presumed to be valid. New Jersey State League of Muns. v. Dep't of Comm. Affairs, 158 N.J. 211, 222, 729 A.2d 21 (1999). In general, the judiciary recognizes that agencies' specialized expertise renders them particularly well-equipped to understand the issues and enact the appropriate regulations pertaining to the technical matters within their area. Ibid. Thus, in general, the judicial role in reviewing regulations is limited to three inquiries:
(1) whether the agency's action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors.

[In re Petitions For Rulemaking N.J.A.C. 10:82-1.2 and 10:85-4.1, 117 N.J. 311, 325, 566 A.2d 1154 (1989).]
The party challenging the validity of a regulation bears the burden of establishing that it is arbitrary, capricious, or unreasonable. New Jersey State League of Mun. v. Dep't of Comm. Affairs, supra, 158 N.J. at 222, 729 A.2d 21.
Appellants claim that de novo review is required because "the regulatory issues on appeal implicate fundamental constitutional dictates and not matters of regulatory action under a grant of statutory delegation ...." However, these regulations were in fact promulgated pursuant to the statutory authority granted by the Legislature. See N.J.S.A. 18A:7F-35 and -36. Although the Legislature acted pursuant to the Court's direction and based on the Court's determination that the existing statute was unconstitutional, the Legislature was the sole authority capable of granting the DOE the power to act. General Assembly of N.J. v. Byrne, 90 N.J. 376, 393, 448 A.2d 438 (1982). Thus, essentially we are called upon to decide whether the challenged regulations, adopted pursuant to a legislative grant, conform to the mandates of the Court in Abbott V and Abbott VI. The technical challenges by appellants to specific regulations simply do not raise issues which reach a constitutional level.
Appellants further claim that de novo review is appropriate here because in Abbott VI "the Court did not hesitate to review de novo Appellants' claims of State non-compliance with the mandate" set forth in Abbott V. We do not agree. In Abbott VI, supra, 163 N.J. at 101-04, 748 A.2d 82, the Court examined the regulations for specific conflicts with the Commissioner's proposals that the Court had adopted in Abbott V. This comparison was appropriate because the enabling act for the regulations specifically directed the Commissioner to "adopt regulations to implement the order of the Supreme Court of New Jersey in Abbott v. Burke ...." N.J.S.A. 18A:7F-36. Only in instances where the Court found direct conflicts between the Commissioner's proposals and the regulations did it order that the regulations be amended to codify the proposals. See Abbott VI, supra, 163 N.J. at 107-17, 748 A.2d 82. The Court neither engaged in wholesale de novo review nor acceded to appellants' request that the Court designate a Superior Court judge as *421 a standing master to supervise implementation of the Abbott reforms. Id. at 100, 120, 748 A.2d 82.
It is true that in both Abbott V and Abbott VI, the Court became involved in evaluating many details of the reforms proposed by the Commissioner. The Court's analysis was based, however, on a factual record developed by Judge King, and the Court's decision to retain temporary jurisdiction over a complex, far-reaching matter whose solution it had mandated. The Court in fact stated its intention to step away from its role as overseer of the process and allow the legislative and administrative systems to carry out their respective functions. Abbott VI, supra, 163 N.J. at 100, 119-20, 748 A.2d 82; Abbott V, supra, 153 N.J. at 490, 710 A.2d 450.
We therefore reject appellants' argument that the standard of review should be de novo.
II
THE DOE'S FAILURE TO CODIFY STANDARDS AND PROCEDURES
Appellants and amicus advance the general assertion that the regulations fail to codify the remedial measures mandated by Abbott V for WSR implementation. They raise the following specific challenges.
A
Standard-Based Education
Appellants claim that the regulations do not codify the Abbott mandate for standard-based education because they improperly delegate to the developers of the WSR models, the districts and the SMTs, the obligation to conform the WSR models and curriculum to content-and-performance standards set forth in the CCCS, and also fail to codify the standards, procedures and guidelines involved in this task. We reject the argument.
The CCCS "define what all students should know and be able to do by the end of their public school education." N.J.A.C. 6A:8-1.1. The standards are the centerpiece of CEIFA. Abbott IV, supra, 149 N.J. at 161, 693 A.2d 417.
The [CCCS] specify expectations in seven academic content areas: the visual and performing arts, comprehensive health and physical education, language arts literacy, mathematics, science, social studies, and world languages. The [CCCS] also include the following five Cross-Content Workplace Readiness Standards: career planning; use of technology, information, and other tools; critical thinking, decision making, and problem solving; self-management; and application of safety principles.
[N.J.A.C. 6A:8-1.1.]
In Abbott IV, supra, 149 N.J. at 161-62, 693 A.2d 417, the Court recognized that "[t]he standards are not a curriculum; rather, they define the results expected without prescribing specific strategies or educational methodologies to ensure that students actually meet those expectations. The development of a curriculum to deliver the educational achievement levels required by the standards is left to the local districts."
In Abbott V, supra, 153 N.J. at 498, 710 A.2d 450, the Court considered appellants' complaint that the SFA would not provide the constitutionally guaranteed thorough and efficient education to which they were entitled because the plan was not tied to the CCCS. The Court accepted evidence that the SFA could be adapted to fit standards of success established by various states and thus could incorporate the CCCS. Ibid. Appellants now claim that the regulations ignore "the State's constitutional *422 duty" to conform the SFA and the four alternative WSR models to the New Jersey CCCS because they improperly, arbitrarily, and capriciously delegate to the districts and the SMTs the task of ensuring that the WSR model adopted by a particular school conforms to the CCCS.
In fact, both the regulations and the statutory scheme provide that the Commissioner retains ultimate responsibility for ensuring that the selected programs conform to the standards. First, to gain approval for a particular WSR model, the developer "must align all instructional materials and all instructional processes in the model with the [CCCS]." N.J.A.C. 6A:24-4.1(a). Second, the WSR implementation plan submitted by the SMTs must "[e]nsure that the curriculum is aligned with the [CCCS]...." N.J.A.C. 6A:24-4.3(a)5. In addition, the Chief School Administrator for each district must ensure that each model adopted in the district is aligned with the standards. N.J.A.C. 6A:24-1.4(o). Rather than the improperly delegating authority, the regulations provide that each level of administration involved in the process, from designer to parents to superintendent, is responsible for properly performing the critical function necessary at that level that will ensure that the programs conform with the standards. Appellants offer no basis for rejecting the Commissioner's conclusion that the professionals who developed the particular WSR model are also the group best suited to adapt it to incorporate the CCCS.
Similarly, appellants complain that the regulations fail to explain the meaning of "key terms" such as "alignment, articulation, continuity, collaboration, instructional materials, instructional processes, and instructional delivery systems." However, we have no reason to believe that those in the educational field require definitions for such terms. Regulations are subject to the same rules of construction as a statute and should be construed according to the plain meaning of the language. Medford Convalescent and Nurs. Ctr. v. Div. of Med. Assist. and Health Servs., 218 N.J.Super. 1, 5, 526 A.2d 1087 (App.Div.1985). Appellants offer no examples of confusion, double-meaning, or misunderstandings likely to occur if the terms remain undefined and subject to their common meaning.
Appellants also argue that the regulations fail to provide standards and procedures for CCCS-related tasks and time frames for completing the tasks. They claim further that the regulations fail to provide models from schools that have successfully conformed their curriculum; and fail to codify the requirements for the professional programs that the DOE directs staff to utilize in implementing WSR. Appellants provide no basis, however, for their assertion that explicit codification of these models and standards is either specifically mandated by Abbott or necessary for the accomplishment of Abbott objectives. Similarly, they offer no reasons to assume that the model developers, SMTs, and others involved in the process are incapable of accomplishing their assigned obligations without the specific direction demanded by appellants. Moreover, despite their criticisms, appellants offer no specific standards, definitions, or procedures to supplement or remedy the gaps that they claim exist.
B
Whole-School Reform Programs
Appellants allege that the 1999-2000 regulations failed to codify the standards, procedures, and guidelines for the minimum elements of the Abbott WSR program for elementary schools including the requirements for: an integrated pre-school *423 education; the SFA early literacy program; a full-time instructional facilitator in every school; a professional development program; a family support team to address student social and health needs; an enhanced technology program; a needs-based security program; and a class-size reduction program. In their supplemental brief, appellants acknowledge that the DOE "made a few amendments to the regulations" pertaining to WSR in elementary schools, but they allege that "none of [the amendments] correct the failure to codify that remedial measure."
In addition to their claims alleging insufficiency in the codification of programs for elementary schools, in their primary brief appellants claim that the regulations fail to codify minimum requirements for supplemental programs in middle and high schools including coordination and referral for social and health services, an enhanced technology program, a needs-based security program, an alternative education program, a drop-out prevention program, and school-to-work and college transition programs. In their supplemental brief, appellants make no claims regarding the 2000-2005 regulations. The regulations pertaining to elementary and secondary schools are discussed separately.
(a) Elementary Schools
Appellants first contend that the DOE "completely ignores the explicit directive in Abbott V that WSR incorporate the requirements for preschool education." This assertion ignores the framework for early childhood education set forth in the amended regulations, Subchapter 3, N.J.A.C. 6A:24-3.1 to -3.4. The only reference to Abbott V cited by appellants in support of this argument is the Court's discussion of the precise elements later incorporated into Subchapter 3, including full-day kindergarten and preschool for three- and four-year olds. See Abbott V, supra, 153 N.J. at 502-08, 710 A.2d 450.[2]
Appellants also argue that the regulations fail to codify specific program requirements for the literacy component of SFA. In evaluating the Commissioner's proposal for implementation of WSR and his recommended version, SFA, the Court described the functional elements of the SFA reading program as involving daily ninety-minute reading sessions, with the students placed in groups of fifteen organized according to reading level. Id. at 495, 710 A.2d 450. In addition, under the SFA program daily individual tutoring should be available for the younger children in grades one through three, and daily group tutoring sessions for the students in the higher elementary grades. Ibid. Nowhere, however, in its opinion did the Court mandate the adoption by every school of the SFA model or the codification of the SFA components. To the contrary, the Court "adopt[ed] Judge King's recommendation `that the State require the Abbott districts to adopt some version of a proven, effective whole-school design with SFA-Roots and Wings as the presumptive elementary school model.'" Id. at 501, 710 A.2d 450. It directed only that the SFA "contain the essential elements identified by the Commissioner." Ibid. This mandate was consistent with the Court's recognition that a key element of the success of WSR is the involvement of school personnel and parents, and its recognition that individual schools had different needs that were best understood by *424 those involved in the daily life of the school.
In accordance with the Court's instruction, the regulations do not require that a school adopt a particular WSR model. The selected model must be, however, a research-based model or an alternative design, which must comport with certain requirements set forth in the regulations. N.J.A.C. 6A:24-4.1 to -4.2. Moreover, the regulations specifically define SFA Roots and Wings as the "nationally-proven [sic] research-based whole school reform model developed by Dr. Robert Slavin ... [that] shall include the enhancements made by Dr. Slavin to the model so as to meet New Jersey requirements." N.J.A.C. 6A:24-1.2. Appellants offer no evidence that the lack of codification of specific elements of the SFA literacy program conflicts with the Commissioner's proposals or undermines existing standards.
Appellants further argue that "[t]here is no codification of the minimum elements of the minimum professional development program adopted in Abbott V ...." In Abbott V, supra, 153 N.J. at 496, 710 A.2d 450, the Court described details of the Commissioner's recommended program of professional development for members of the SFA instructional teams, which included at least three full days of training prior to the school year, a week-long training session for the principal and school facilitator, weekly in-school training sessions, and three two-day evaluations by SFA staff. The regulations provide only that: "All staff of the school shall be engaged in an organized, continuous program of staff training, focused on the acquisition of knowledge and skills directly related to the achievement of the Core Curriculum Content Standards and the implementation of the selected WSR model." N.J.A.C. 6A:24-4.1(i)6. Although this regulation does not codify the specific program elements described by the Court, neither does it conflict with or prevent the DOE from implementing the form of professional development program described in the recommendations.
Appellants further claim that despite the Court's "unequivocal instruction on the maximum number of students per class," the DOE failed to direct the implementation of reduced class sizes, to provide guidance on methods to reduce class size, or to set forth "how to secure any additional funds" necessary to achieve this requirement. In Abbott V, supra, 153 N.J. at 498-99, 710 A.2d 450, the Court observed that the Commissioner proposed a reduction of class sizes to twenty-one students for kindergarten through third grade, and twenty-three students for fourth and fifth grade, with reading classes of fifteen students for grades K-5. It rejected appellants' argument that class sizes for all subjects should be reduced to fifteen students, and concurred in "Judge King's recommendation that it will not be essential to reduce class size in the elementary schools to an extent greater than that proposed by the Commissioner." Ibid.
The regulations provide that, for schools implementing a WSR model: "A plan shall be in place to continue to reduce class size by September 2002 to 1:21 for grades K through 3 and 1:23 for grades four through eight and 1:24 for grades nine through 12. The plan shall also include an aide in kindergarten." N.J.A.C. 6A:24-4.1(j)9. For schools implementing an alternative design model: "The design shall reduce class size in grades K through 3 to 21 children and in grades four through eight to 23 children and in grades nine through 12 to 24 children or demonstrate a program of smaller class sizes geared to more effective learning, including reading class size reduction[.]" N.J.A.C. 6A:24-4.2(c)5. Thus, the regulations clearly implement the Court's directive regarding class size in the elementary schools.
*425 Appellants attack the regulations for failing to provide guidance on "methods" to achieve the reduction, for delaying the requirement until 2002, and for ignoring the requirement to reduce reading class sizes to fifteen students. Appellants offer no examples of any "methods" that exist, beyond the obvious method of lowering the ratio of students to teachers, that would have the effect of reducing class size, or which were cited by the Court in Abbott V. They do not explain why implementing this goal would require separate procedures for obtaining funds distinct from those procedures established in the overall Abbott statutory and regulatory scheme. As to the class size for reading groups, the fifteen-student class size pertains to schools who have adopted the SFA program for reading. Other programs may approach the issue of reading in an entirely different manner, for example, by utilizing computers or audiotapes in which class size is less relevant. Neither the Court nor the regulations mandate the imposition of SFA as the exclusive reading program, and there is no basis for imposing a class-size requirement that may be antithetical to the methods of a particular, accepted alternative reading program.
In their initial brief, appellants allege that the regulations pertaining to enhanced technology programs: (1) fail to provide definitions for terms that it deems "critical," such as "educational technology, equipment and infrastructure, and appropriate staff"; (2) fail to specify computer ratios or minimum staff levels; fail to direct schools to provide a full-time technology coordinator; and (3) "do[ ] not codify at all the requirement for an additional full-time media specialist in every school."
In Abbott V, supra, 153 N.J. at 514-15, 710 A.2d 450, the Court discussed the Commissioner's proposal for a technology program that would provide one computer for every five students in grades K-12, a full-time media/technology specialist, and a full-time technology coordinator. The Court discussed the program, however, within the context of the "supplemental programs" for which it recognized that the Abbott schools would have varying needs. Id. at 514-517, 710 A.2d 450. Consequently, rather than ordering the as-is adoption of the proposals, the Court "authorize[d] [the Commissioner] to implement technology programs at the request of individual schools or districts or as he otherwise shall direct." Id. at 517, 710 A.2d 450.
N.J.A.C. 6A:24-1.4(f) requires that the local board "shall provide for a full-time media specialist responsible for ensuring that school libraries have appropriate materials to supplement the curriculum and to address the [CCCS]," although it does not state whether the specialist would be district-wide or at each school. N.J.A.C. 6A:24:1.4(g) provides for a "full-time technology coordinator" at each secondary and elementary school.
We reject appellants' arguments that a single media specialist for the district is insufficient and that the regulations include the standards for the qualification and duties of the position. The Commissioner is given discretion in implementing a technology program and appellants have provided no evidence of critical criteria omitted from these regulations.
We further reject appellants' claim that the regulations are deficient because they do not enumerate the specific duties and qualifications of particular members of a school's Family Support Team and do not specify the school's right to provide health services based on demonstrated need. School personnel will have sufficient hands-on knowledge of the qualifications of members of the community to staff the team. As to school-based health services, Subsection 5 of the regulations sets forth *426 procedures for demonstrating particularized need for all non-required programs. Therefore, no specific regulation is needed here. Moreover, contrary to appellants' argument, the regulations pertaining to family support teams, N.J.A.C. 6A:24-4.1, generally track the Court's described purpose and goals of such teams. Abbott V, supra, 153 N.J. at 496, 710 A.2d 450.
Appellants also attack the regulations pertaining to security programs for the elementary schools which they claim "plainly violate Abbott V." The Court recognized that security was a "critically important factor in the provision of a thorough and efficient education." Id. at 514, 710 A.2d 450. It rejected the Commissioner's proposal to provide one security guard for every 535 elementary school students and one guard for every 225 middle and high school students, because those numbers were based on submissions from only two school districts. Id. at 513, 710 A.2d 450. It observed that "[w]ithout a link to actual needs, the Commissioner's proposal lacks an evidentiary basis." Id. at 514, 710 A.2d 450. Instead, the Court held "that individual Abbott schools or districts have a right to request supplemental programs for security and that the Commissioner must authorize the requested programs that are based on demonstrated need and secure or provide necessary funding." Ibid.
The regulations provide that the local board
shall implement a Department approved district wide security plan that includes a Code of Student Conduct, and one security guard for each elementary school building and one for each 225 students at the secondary level as part of the board's plan. As part of the board's plan, it may apply for a waiver of the required number of security guards pursuant to (e) above.
[N.J.A.C. 6A:24-1.4(i).]
Thus, contrary to the Court's direction, this regulation codifies the proposal it rejected and fails to establish a mechanism to implement security programs adapted to a school's specific needs. In addition, in the subchapter pertaining to WSR implementation, the regulations provide that the WSR model must address security in the following manner:
Safe School Environment Conducive to Learning: The school climate must be safe and conducive to learning. There shall be a code of conduct that clearly defines acceptable and unacceptable student behaviors and the consequences for them. The district shall provide required security staff and other necessary protective devices as set forth in N.J.A.C. 6A:24-1.5(h).
[N.J.A.C. 6A:24-4.1(i)7.]
The problem with this provision is that N.J.A.C. 6A:24-1.5(h) does not exist. Section 6A:24-1.5 is a paragraph that sets forth district accountability requirements; section 6A:24-1.4(h) pertains to dropout prevention measures and the health and social services coordinator. No regulation discusses what protective devices are deemed necessary.
Thus the security provisions in the regulations are inconsistent with each other and with Abbott. The Court's recognition of the critical role that security programs play in the education of children in all Abbott schools suggests that the Court intended that specific regulations pertaining to security needs should be developed, rather than be included in the general regulations and procedures for obtaining supplemental educational programs and services. The regulations pertaining to security programs, N.J.A.C. 6A:24-1.4(i), and N.J.A.C. 6A:24-4.1(i)7, must therefore be remanded for development of a regulation *427 that allows each school to provide evidence of its security needs.
Appellants' final argument regarding implementation of WSR programs is that the regulations fail to codify the requirement for a full-time instructional facilitator in each school. A conflict does arise in this area because, although the Commissioner clearly proposed to the Court a full-time, school-wide instructional facilitator, Abbott V, supra, 153 N.J. at 497, 710 A.2d 450, the regulations merely provide that "[a] teaching staff member shall be designated to ensure that all the elements of the design are properly implemented and coordinated[.]" N.J.A.C. 6A:24-4.2(c)8. Thus the regulation is unclear as to whether the staff member would have teaching duties in addition to a role as facilitator, a component that would be contrary to the Commissioner's proposal. Regulation N.J.A.C. 6A:24-4.2(c)8 must therefore be remanded for amendment to specify that the facilitator's position is devoted exclusively to implementation of the WSR program.
(b) Middle and High Schools
Appellants argue that the Court "issued detailed directives on the minimum supplemental programs for middle and high schools" and the regulations "fail[ ] to codify the required elements...." Appellants claim, first, that these regulations "eviscerate[ ]" the Court's requirements that the secondary schools provide social and health services through coordination and referral to community-based agencies and that the schools can provide on-site services based on demonstrated need.
In Abbott V, supra, 153 N.J. at 511, 710 A.2d 450, the Court rejected Judge King's proposal that schools be required to provide on-site health and social services. The Court reasoned, first, that the type of services necessary and the appropriate model for delivery were especially dependent on the needs of an individual school. Id. at 511-12, 710 A.2d 450. Second, the Court "acknowledged that the provision of such health and social services, although intimately affecting public education in the special needs districts, is not the exclusive responsibility of the DOE." Id. at 512, 710 A.2d 450. The Commissioner was directed to provide a community services coordinator in every middle and secondary school in order to identify student need and arrange for community-based providers to furnish essential health and social services. Ibid. The Court also reiterated that schools and districts had the right, based on demonstrated need, to "obtain the resources necessary to enable them to provide on-site social services that either are not available within the surrounding community or that cannot effectively and efficiently be provided off-site." Id. at 512-13, 710 A.2d 450. Furthermore, the Commissioner had "a corresponding duty to authorize requested school-based social service programs for which there is a demonstrated need and to provide or secure necessary funding." Id. at 513, 710 A.2d 450.
In our view, the pertinent regulation satisfies the Court's directives. It provides that the SMT must submit a plan that includes "[a] mechanism for access to the health and social services identified by the SMT as being essential for the educational achievement of students, through utilization of existing district staff, programs and services, and through coordination of and referral to community-based providers[.]" N.J.A.C. 6A:24-6.1(a)1. Although appellants challenge the regulation because it "mandates the use of `existing district staff' rather than requiring a coordinator in every school," they acknowledge that, elsewhere, the regulations require each board to "provide *428 for ... a full-time staff member responsible for the coordination of health and social services and the referral of students to such services for each secondary school within the district." N.J.A.C. 6A:24-1.4(h). The problem, according to appellants, is that the regulations are unclear as to whether a full-time coordinator is required in each school, or only in each district and, furthermore, the regulation "fails to provide standards, procedures and guidelines" on the duties and qualifications for the coordinator position. Appellants provide no evidence that the local school districts have found the direction in these regulations to be confusing. Moreover, appellants offer no suggestion of what the regulations should include, nor do they establish that the regulations are contradictory to the Court's direction in Abbott V.
In addition, appellants challenge the regulations pertaining to various supplemental programs, including an enhanced technology program, an alternative education and dropout prevention program, and school-to-work and college transition programs. They claim that Abbott V "requires" the adoption of each of these programs, and that the pertinent regulations fail to codify the programs as described in the Court's opinion or Judge King's report.
In Abbott V, supra, 153 N.J. at 513-17, 710 A.2d 450, the Court discussed the Commissioner's recommendations on technology enhancements, alternative schools, individualized instruction to assist disruptive students and prevent drop-outs, and school-to-work and college transition programs. The Court's response to the supplemental programs issue was as follows:
As with social services and security, there will be varying needs in the Abbott schools for supplemental programs. Consistent with the Commissioner's recommendations, we authorize him to implement technology programs at the request of individual schools or districts or as he otherwise shall direct. We further authorize the Commissioner to implement alternative schools or comparable education programs. Similarly, we direct the [C]ommissioner to authorize accountability programs, as may be deemed necessary or appropriate, and to coordinate them with whole-school reform. We also direct the Commissioner to implement school-to-work and college-transition programs in secondary schools in the Abbott districts at the request of individual schools or districts or as the Commissioner otherwise shall require. In respect of the other supplemental programs, we decline to order their immediate district-wide implementation, even though all such programs are sound in principle. Rather, because the needs for these programs will vary from school to school, we direct the Commissioner to provide or secure the funding necessary to implement those programs for which Abbott schools or districts make a request and are able to demonstrate a need. We reiterate that for middle and secondary schools, which will not have the benefit of whole-school reform, such supplemental programs may be necessary to ensure the educational success of their students.
[Id. at 517, 710 A.2d 450.]
The regulations adhere to this directive as well. They require that the secondary school SMTs: (1) identify students for placement in the district's alternative school program, N.J.A.C. 6A:24-6.1(a)3; (2) submit plans for school-to-work or college transition programs that "address the Cross Content Workplace Readiness Standards of the [CCCS]," integrate academic and occupational concepts and link secondary years to post-secondary educational *429 opportunities, N.J.A.C. 6A:24-6.1(a)4; and (3) infuse technology into all aspects of the curriculum and provide for the acquisition and maintenance of necessary equipment and infrastructure, appropriate developmental activities, and designation of staff, N.J.A.C. 6A:24-6.1(a)5. Furthermore, as with the elementary schools, the SMT in a secondary school may submit applications for additional supplemental programs based on demonstrated particularized need. N.J.A.C. 6A:24-5.1(a).
Appellants' contention that the programs they describe were "required" by the Court is simply incorrect. Although the Court recognized that a specific program might be necessary for the educational success of the students at an individual school, it clearly decided that the statewide imposition in the Abbott districts of particular programs actually might hinder the goal of identifying and responding to the actual needs of the students. The Court's approach was consistent with testimony that research on appropriate WSR programs for secondary schools was being conducted, and programs would be available shortly. Under those circumstances, requiring immediate statewide implementation of specific programs that were merely supplemental presented the real possibility of hindering anticipated efforts to implement WSR programs in secondary schools.
In addition to the above claims, appellants in this section also challenge the regulations pertaining to security programs. The security regulations are not specific to secondary schools and were discussed supra.
C
Selection of WSR and Alternative Reform Models
Appellants challenge the regulations pertaining to selection of WSR models for elementary schools. In addition, they contend that the regulations improperly require middle and high schools to adopt WSR models prior to "the Court-mandated study by the Commissioner" to determine that models for secondary schools are "available and effective."
Appellants argue in their initial brief that the 1999-2000 regulations failed to require the adoption of SFA/R & W by every elementary school, and improperly designated it only as the "presumptive" model, and in their supplemental brief, that the 2000-2005 regulations are deficient even further because they remove the presumption entirely. They also contended that the 1999-2000 regulations failed to codify "the express and limited standards" under which the Commissioner could permit a school to select another model and, instead, improperly permitted him to authorize selection of an alternative model "if justified." They argue that the 2000-2005 regulations remove that standard and elementary schools "now have no guidance whatsoever on the core Abbott V mandateadoption and implementation of SFA/R & W."
Appellants are correct that the Court viewed SFA/R & W as "the presumptive elementary school model" for whole-school reform. Abbott V, supra, 153 N.J. at 501, 710 A.2d 450. Appellants' contentions, however, are difficult to understand in light of the public comment by their representative, the Education Law Center (ELC), at the hearing on the 2000-2005 amendments. Contrary to the position expressed in appellants' brief, at the hearing the ELC "shared a concern that the requirement in the proposed rules that Success For All (SFA) be imposed on schools that fail to adopt a model ... violates SFA policy." 31 N.J.R. at 2940. Presumably, the ELC was referring to the *430 concept that WSR works only if the entire school team "buys into" the selected program. The DOE's response reminded the commentator that the "SFA was identified as the presumptive model" by the Court, but that the rules had been amended to require an intermediate step of employing an intervention team to work with schools that have not chosen a model. Ibid. Thus the deficiency that appellants allege, in part, was implemented to answer the ELC's concern that imposition of a particular model violated the premise of SFA/R & W.
Appellants also contend that the provision that permits a school to adopt a school-developed WSR program "alters" the Court's directive because "[t]here is nothing in Abbott V to even suggest that the Commissioner can permit schools to develop their own models...." In Abbott V, supra, 153 N.J. at 501, 710 A.2d 450, the Commissioner adopted Judge King's recommendation that the State require the Abbott districts to adopt some version of a proven, effective, whole-school design with the SFA/R & W as the presumptive model. At the public hearing, appellants' counsel took the position that the Commissioner had no authority to allow adoption of alternative designs without presenting evidence to support such changes and without the approval of appellants and the Court. See 31 N.J.R. 2942. The DOE disagreed, pointing to the fact that the Court had approved the Commissioner's proposal allowing districts to devise their own research-based designs and standards necessary to do so. Ibid. The DOE's position was entirely consistent with Judge King's report to the court. See Abbott V, supra, 153 N.J. at 645, 710 A.2d 450.
Consistent with the Commissioner's position and Judge King's recommendation, the regulations provide extensive and detailed guidelines necessary for adoption of an alternative design and specifically require that "[t]here shall be reliable research supporting the key components of a design and evidence of effective practices, including evidence that the program has worked successfully in the applicant school and/or in other schools with similar characteristics. The design shall identify the research that supports each of its key components[.]" N.J.A.C. 6A:24-4.2(c)2. The regulations explicitly answer Judge King's requirement that each individual component of the program be based on proven, research-based models. Although the Court designated SFA/R & W as the presumptive model, it did not disapprove of the State's proposal that schools be permitted to develop their own designs. The option for schools to develop their own models is consistent with the philosophy behind Abbott V that schools strive as much as possible to meet the needs of the students in the individual school and do so with the whole-hearted support of the entire school team.
Appellants also argue that the regulations fail to codify the mandate for a comprehensive formal evaluation program of the WSR implementation because the provision in the 2000-2005 regulations fails to provide a time frame to commence the evaluation and no deadlines by which the DOE must provide the school with "critical evaluation data" so they can measure their efforts. They charge that the DOE "has already delayed the mandated evaluation for well over two years."
However, the Court's directive was for the Commissioner "to implement as soon as feasible a comprehensive formal evaluation program, modeled on SFA's formal evaluation precedents, to verify that SFA is being implemented successfully and is resulting in the anticipated levels of improvement in the Abbott elementary schools." Abbott V, supra, 153 N.J. at *431 501-02, 710 A.2d 450. The Court also recognized, however, that "[i]t takes three years to implement SFA fully in any given school." Id. at 497, 710 A.2d 450. Implementation of the Abbott directives is a massive undertaking. Appellants' insistence that the DOE's actions are improper because they should have conducted an evaluation of the results two years ago, prior to actual implementation of the programs, and prior to the passage of time to allow for improvement, is simply unrealistic. Moreover, in response to a similar comment from the ELC at the public hearing, the Commissioner explained:
Within each WSR school, a continuous evaluation mechanism is part of the model or alternative program design. This mechanism is designed to ensure that the school itself generates and utilizes timely feedback to improve implementation locally. In addition, the State has solicited proposals from qualified bidders for a three-year evaluation of the Whole School Reform Initiative in the Abbott schools; these proposals are currently under review.
[32 N.J.R. at 2474.]
Thus the DOE, in fact, conducts ongoing evaluations and has made appropriate provisions for a more formal evaluation.
Finally, appellants allege that the 1999-2000 regulations improperly required secondary schools to submit a plan for adoption of a WSR model, and the 2001-2005 amendments "continue[ ] to violate Abbott V by compelling the adoption of WSR models in middle and high schools without the Court-mandated study by the Commissioner." In Abbott V, supra, 153 N.J. at 508 n. 5, 710 A.2d 450, the Court observed that testimony showed that WSR programs were being developed for middle and secondary schools and "might be introduced" in Abbott schools by September 1999. It stated: "We infer that the Commissioner will at that time determine whether the introduction of whole-school reform in Abbott middle and secondary schools is appropriate." Ibid. The Court did not "mandate" that the Commissioner conduct a formal study prior to implementation of the programs; nor did it preclude the Commissioner from taking steps in preparation of that goal. In response to the ELC's comment at the public hearings on July 3, 2000, the DOE explained:
This year, the Department intensified its focus on assisting middle schools and high schools with the WSR matching process through a variety of activities. The outcome of the three symposiums and secondary school work group sessions conducted this year was featured in the first edition of the Department's newsletter, the WSReporter. A listing of WSR models with promise for use by middle and secondary schools was contained in this publication and showcased at the Middle and High Schools Symposium III on May 15, 2000.
[32 N.J.R. at 2474.]
Thus, contrary to appellants' suggestion, the DOE's regulation was based on a study of available programs. Appellants offer no reason to conclude that the DOE's approach was improper or violative of Abbott V.
D
School-Based Management Teams
Appellants argue that the regulations fail to codify standards, guidelines, and procedures for the school-based management teams, including guidelines for SMT duties, training, and the school district's role in school-based management, and state support for school-based management. Amicus contends that the regulations pertaining to SMTs and SRIs are invalid because SMTs are an "amorphous entity" unauthorized by Abbott V, the regulations *432 pertaining to the role of SMTs and SRIs are too vague and, to the extent the regulations provide SRIs with supervisory authority over SMTs, they conflict with the concept of whole-school reform. Amicus also contends that the regulations afford the SMTs an improper role in employment matters, and are invalid because they provide no guidance to the SMTs on meeting the needs of non-English speaking students.
The amended regulations provide that SMTs are to:
1. Ensure that curriculum, instruction, and the instructional delivery system are aligned with the Core Curriculum Content Standards;
2. Review the Statewide assessment results at school and grade levels to determine program and curriculum needs and to take appropriate action to improve and enhance student achievement;
3. Ensure that a program of professional development to assist staff in the implementation of all aspects of WSR is being utilized by the school;
4. Ensure implementation of a school-level educational technology plan approved by the Department that is integrated with the district-level educational technology plan demonstrating how educational technology will be infused throughout all aspects of curriculum and instruction to support achievement of the Core Curriculum Content Standards, and providing for acquisition and maintenance of necessary equipment and infrastructure, appropriate professional development activities and designation of staff to implement technology activities;
5. Ensure that education programs, including co-curricular and extracurricular activities, are provided to address the Cross-Content Workplace Readiness Standards of the Core Curriculum Content Standards. At the secondary level, the curriculum should integrate academic and occupational concepts, the opportunity for students to participate in a structured learning experience, as well as programs that link the secondary years to postsecondary educational opportunities;
6. Implement a school-based system of rewards consistent with the district wide system of rewards established pursuant to N.J.A.C. 6A:24-1.5; and
7. Establish work groups as needed that include SMT members and non-SMT members to maximize participation by non-SMT members.
[N.J.A.C. 6A:24-2.2.]
Appellants and amicus do not state what additional information should be included in the regulation, nor do they explain how the above regulations violate Abbott. Instead they merely assert that the regulations' descriptions of duties are insufficient and must be further defined because the SMTs will include parents and community members. We do not agree.
As to training of SMTs, appellants allege that the regulations are insufficient because they "generally list[ ] required training topics" without requiring members "to become informed about the specific details of the Abbott measures, including standards-based education, supplemental programs, facilities, preschool education, needs-driven planning, and adequate funding." As to school-district involvement with the SMTs, appellants allege the regulations fail to codify "standards, procedures and guidelines to effectuate the duties imposed on districts to establish, support, coordinate and sustain the effective functioning of SMTs" and fail to include standards for determining whether to approve a WSR plan. Each of these *433 allegations posit requirements for regulations without offering any basis other than appellants' own view that the regulations should include the matters they assert are needed. In some respects their assertions take the regulations out of context and ignore the existence of the entire statutory and regulatory scheme undertaken to implement school reform in the Abbott districts. For example, they assert that the regulations fail to codify State support for school-based management because the only mechanism provided in the regulations for facilitating the implementation of the Abbott directives is assignment of a SRI to each school that implements WSR. Appellants charge that the regulation is insufficient because it "fails to codify the requirement for State resources, support and assistance sufficient to effectuate local implementation." This allegation simply ignores the massive framework for State support encompassed in the Comprehensive Educational Improvement and Financing Act of 1996, N.J.S.A. 18A:7F-1 to 36, the Educational Facilities Construction and Financing Act, N.J.S.A. 18A:7G-1 to -44, and the regulations themselves.
We reject amicus' contention that the regulations "improperly permit SMTs to alter negotiated terms and conditions of employment, interfere with statutory prerogatives of the Chief School Administrator and school board, and improperly authorize access to confidential personnel information." Amicus bases these arguments on the content of two regulations. The first, N.J.A.C. 6A:24-2.2(b)6 allows the SMT, in consultation with the SRI, to "[i]mplement a school-based system of rewards consistent with the district wide system of rewards established pursuant to N.J.A.C. 6A:24-1.5[.]" That regulation provides "rewards to recognize schools, teachers, parents, and administrators who contribute to helping students attain the [CCCS] pursuant to a district plan...." N.J.A.C. 6A:24-1.5. Amicus makes no showing, however, that this system in fact would result in "unilateral modification" of teachers'"terms and conditions of employment." Until evidence exists to support amicus`s contention, there is no basis for judicial interference with the content of the regulation.
Amicus also objects to N.J.A.C. 6A:24-2.2(c), which provides:
Annually, each SMT of a WSR school shall be authorized to undertake the responsibilities under (c)1 and 2 below after a majority vote of its members and upon approval of the SRI Team. The SRI Team shall not approve the SMT to undertake these responsibilities unless and until the SMT has had specific training in these areas. In accordance with this subsection, each SMT of a WSR school shall:
....
2. Make recommendations for the appointment of a building principal, of teaching staff members, and of instructional aides for early childhood programs providing not less than three candidates to the Chief School Administrator, who may select one of the three candidates for recommendation to the board pursuant to N.J.S.A. 18A:27-4.1. The Chief School Administrator may request additional candidates from the SMT. The Chief School Administrator shall not recommend to the board any such candidates for appointment unless the SMT has recommended that candidate to the Chief School Administrator.
Amicus claims that section (c)2 is invalid because SMTs "cannot and should not be involved in appointing teaching staff members, transferring teaching staff members, or in selecting specific staff members, since the statutes require that this function be performed by the Chief School Administrator *434 and the school board." Under N.J.S.A. 18A:27-4.1a, a board of education may appoint, transfer, remove, or renew the employment contract of an employee "only upon the recommendation of the chief school administrator and by a recorded roll call majority vote of the full membership of the board." Amicus does not show how the regulations intrude with this statutory provision. The regulations provide the SMTs with the authority to make recommendations, no more. The final decisions to hire, fire, or transfer, remain with the Chief School Administrator, not the SMTs.
In sum, with limited exceptions, we reject appellants' allegations that the regulations fail to codify the Court's mandate for standards-based education. The exceptions are the regulations pertaining to security needs, N.J.A.C. 6A:24-1.4(i) and -4.1(i)7, and the position of WSR facilitator, N.J.A.C. 6A:24-4.2(c)8. Those regulations should be remanded for revision in accordance with the Court's directions in Abbott V, as explained supra.
III
FACILITIES
In their initial brief, appellants alleged that the 1999 2000 regulations that were codified at Chapter 19A failed to codify the minimum standards for facilities as required by Abbott V. Those regulations were replaced in the 2000-2005 amended regulations by N.J.A.C. 6A:24-8.1 and its subparts, which pertain to long-range facilities plans, requests for space, and calculations of cost. In their supplemental brief, appellants argue that the amendments still fail to correct the deficiencies in the former regulations.[3]
Since the filing of briefs in this matter, the Legislature has enacted the Educational Facilities Construction and Financing Act (EFCFA), L. 2000, c. 72 (N.J.S.A. 18A:7G-1 to -44). Pursuant thereto, new regulations were adopted, N.J.A.C. 6:23A-1 to -7.1, later expanded and recodified as N.J.A.C. 6A:26-1.1 to -17.1, effective October 1, 2001. This entire chapter of regulations provide a comprehensive scheme for initiation and review of school facilities projects, calculations of costs and other elements of facilities' projects which is far more extensive than the regulations challenged here.
Neither the provisions of the EFCFA nor the new regulations have been challenged in the present appeal. Accordingly, by letter dated October 17, 2001, we advised the parties that:
We are in agreement with the Attorney General that any issues concerning educational facilities should be addressed by separate appeal challenging the newly-adopted facilities regulations. We assume that the challenge to the new regulations will subsume any, if not all, issues presently pending on this appeal relating to educational facilities. If we are incorrect, the Center's right to readopt its present arguments raised here in its subsequent appeal is preserved.
*435 Consequently, we do not address the issues relating to educational facilities raised by appellants in the present appeal.
IV
MAINTAINING AND EXTENDING PROGRAMS BASED ON PARTICULARIZED NEED
Appellants assert throughout the various sections of their briefs that the DOE failed to codify "the right and responsibility to maintain or extend" various programs or supplemental programs based on demonstrated need. The DOE argues that the regulations allow schools to demonstrate a particularized need unmet by implementation of WSR or its required programs, and to request additional State aid in a manner that appropriately balances the needs of the school with necessary review and oversight by the DOE. Moreover, it contends that many of appellants' arguments emanate from "the difficulties that inhere in the first year implementation of a sweeping reform effort," and that many issues have been resolved by amendment of the regulations and in practice.
Appellants' allegation that the regulations fail to codify a school's "right and responsibility" to maintain or extend a host of supplemental programs ignores the procedures set forth in Subchapter 5, "Supplemental Programs and Services," implemented precisely for the purpose of allowing a local board to obtain approval for supplemental programs for a particular elementary or secondary school. N.J.A.C. 6A:24-5.1 to -5.2. The SMT determines whether a particularized need exists by assessing student achievement in meeting CCCS, N.J.A.C. 6A:24-5.1(b)1, and if the CCCS are not being met, the SMT determines whether the deficiency is caused by failure of existing programs, and explains why that is so, N.J.A.C. 6A:24-5.1(b)2. The SMT then recommends to the local board an appropriate program to meet the need, along with documented evidence that the program has succeeded in other schools. N.J.A.C. 6A:24-5.1(c). If the board disagrees, it shall provide the SMT with a list of its reasons. N.J.A.C. 6A:24-5.1(c)1. If it agrees with the SMT's conclusions, it shall submit the plan for approval and, if the board also determines that existing resources are insufficient, it shall apply for additional State aid, in accordance with the requirements of N.J.A.C. 6A:24-7. N.J.A.C. 6A:24 5.1(c)2 and -5.1(c)3. That regulation sets forth the applicable procedures for requesting additional state aid, whether to be used for support of the programs required by the Abbott cases, or for DOE-approved supplemental programs.N.J.A.C. 6A:24-7.1.
Although the regulations do not codify the "right" to obtain aid for any particular program, they provide a mechanism that allows a school to demonstrate its need for a program, put forth the program it has selected to fill that need, and obtain the necessary funding for the program's implementation. Nothing in Abbott V requires more, or mandates a school's "right" to obtain aid for any program that it desires, especially without demonstrating a need and the availability of a program that will meet that need. To the contrary, the Court stressed that, with respect to supplemental services and programs such as on-site health care services, the provision of such program "should not be detached from the actual needs of individual Abbott schools and districts." Abbott V, supra, 153 N.J. at 511, 710 A.2d 450. It concluded that "[t]he particularized needs of an individual school will inform the decision of what type of program is necessary; different schools will have different health and social service needs depending on their student population and their location." Id. *436 at 511-12, 710 A.2d 450. The Court held that
individual schools and districts have the right, based on demonstrated need, to request and obtain the resources necessary to enable them to provide on-site social services that either are not available within the surrounding community or that cannot effectively and efficiently be provided off-site. Conversely, we hold that the Commissioner has a corresponding duty to authorize requested school-based social service programs for which there is a demonstrated need and to provide or secure necessary funding.
[Id. at 512-13, 710 A.2d 450.]
The Court specifically declined to order immediate district-wide implementation of summer school and after-school programs. Id. at 517, 710 A.2d 450. Instead, consistent with its conclusion regarding on-site health care services, the Court held that, "because the needs for these programs will vary from school to school, we direct the Commissioner to provide or secure the funding necessary to implement those programs for which Abbott schools or districts make a request and are able to demonstrate a need." Ibid.
The regulations in Subchapter 5 do precisely what the Court directed: they allow a school to demonstrate a need for a program and to request funding for it. Appellants only specific basis for disputing the supplemental program regulations is their allegation that the definitions of "supplemental program" and "particularized need" remain "wholly improper," even after amendment.
The regulations defined "[s]upplemental program" as follows:
"Supplemental program or service" means any existing or requested program or service that is in addition to the components of the chosen WSR model, required programs in secondary schools or the alternative program design that may result from the needs that are essential to ensure educational success for a specified population of students and without which such students cannot achieve the Core Curriculum Content Standards.
[N.J.A.C 6A:24-1.2.]
Appellants contend that this definition is faulty because "it fails to convey the Abbott V directive that Abbott schools be given the opportunity, based on demonstrated need, both to extend programs already in place ... and to implement other programs not mandated for immediate implementation, such as summer school and afterschool programs." When read together with the provisions in Subchapter 5, however, this definition clearly provides schools with the opportunity to obtain funding for any kind of supplemental program based on demonstrated need. The regulations are not required to do more.
Appellants also challenge the regulations' definition of "particularized need" as one that "narrow[s] the scope of student need to only those needs that are overtly academic." The regulations define "[p]articularized need" as follows:
"Particularized need" means a need that is supported by an assessment of needs of a specific population of students in a given school or for early childhood programs in the district, that has been demonstrated to be the cause of student failure in achieving the Core Curriculum Content Standards, that can be remedied or corrected by a program or service, which has been formally evaluated to demonstrate its effectiveness, and is a need that is not effectively addressed by a WSR model or a whole school alternative program design and by the required supplemental programs.
[N.J.A.C. 6A:24-1.2.] *437 The DOE argues that particularized need must be based on educational need and therefore must be linked to student achievement of the CCCS. It contends that this standard is consistent with the Court's holdings in its previous Abbott decisions. In Abbott V, supra, 153 N.J. at 509-23, 710 A.2d 450, the Court engaged in an extensive discussion of supplemental programs, including social services, and the requirement that the Commissioner provide these programs where a school has demonstrated a particularized need. The Court's discussion, however, neither defined nor provided any guidelines for determining what constitutes a demonstrated particularized need. It acknowledged the positive link between the provision of programs such as health and social services, and students' academic performance, attendance, and dropout rates. Id. at 509, 710 A.2d 450. It also recognized that supplemental programs may be critical for the educational success of students in middle or secondary schools that have no WSR program. Id. at 517, 710 A.2d 450. Thus, although the Court acknowledged an undeniable relationship between academic achievement and the provision or absence of various types of supplemental, but non-academic programs, it expressed no requirement that the need for such programs be established solely in terms of the academic deficiencies that they caused or to which they contributed.
Nonetheless, as the DOE correctly points out, the Court also has recognized that vague standards of past practices permitted schools to misuse money earmarked for "educationally meritorious programs" for purposes such as salary increases, consultants, staff with nondescript title, and transportation. Abbott IV, supra, 149 N.J. at 185 n. 27, 693 A.2d 417. No mechanism was in place to control or monitor the use of additional funding for programs and services made available for supplemental programs. Id. at 160, 693 A.2d 417. The Court also has acknowledged the "dire need for specific programs and funding addressed to the educational needs of these disadvantaged students." Abbott v. Burke, 136 N.J. 444, 453, 643 A.2d 575 (1994) (Abbott III) (emphasis added).
The CCCS indisputably form the basis of the entire reform effort sanctioned by the Court. A standard that requires requests for supplemental programs be linked to the CCCS is consistent with the overall reform efforts instituted by Abbott to improve the educational outcome for students in the Abbott districts. The Court discussed with approval the Commissioner's proposal to implement an accountability standard linked to the CCCS as a means to obtain results that would allow for "informed decisions about program improvement." Abbott V, supra, 153 N.J. at 515, 710 A.2d 450. This method provides a mechanism to ensure that programs are linked to students' needs and actual results, rather than implemented for improper administrative purposes.
Appellants also argue that the absence of standards necessary to determine whether a particularized need exists will allow the DOE "unfettered discretion" in reaching its approval decision. Appellants offer no evidence that the DOE in fact has exercised its discretion in an arbitrary, capricious, or unreasonable manner. The DOE asserts that, to the contrary, in the second year of implementation it received nineteen requests for additional State aid and awarded aid in excess of $156 million to seventeen districts. Appellants' allegations are based on nothing more than speculation.
We reject the claims that the regulations fail to codify appellants' right and the DOE's obligation to maintain or extend programs based on demonstrated need.
*438 V
EARLY CHILDHOOD PROGRAMS
In Abbott VI, supra, 163 N.J. at 108, 112, 748 A.2d 82, the Court ordered revision of N.J.A.C. 6:19A-3.3 to provide that preschool programs be staffed with certified teachers. The Court also examined discrepancies between the standards for early childhood programs established in the regulations and those presented by the Commissioner to Judge King, and reaffirmed the requirement of one certified teacher for fifteen preschool children and the need for standards that comport with the other proposals in the Commissioner's initial report. Id. at 104-119, 748 A.2d 82. The Court also: (1) held that the DOE improperly excluded from its enrollment projections children attending Head Start programs, id. at 116, 748 A.2d 82; (2) admonished the DOE against providing a "form-letter response" to districts' requests for supplemental funding and cautioned that requests "must be handled fairly and quickly," id. at 118, 748 A.2d 82; and (3) directed the DOE throughout to initiate "concerted outreach efforts" to enhance enrollment in preschool programs. Id. at 119, 748 A.2d 82.
In response, the DOE adopted subchapter 3 of Title 6A which addresses in detail early childhood education. Nevertheless, appellants argue that the regulations fail to codify a number of standards and requirements that appellants claim are necessary for a well-planned, high quality kindergarten and preschool education and for uniformity among the programs. Appellants add that the amendments fail to codify explicit directives set forth by the Court in Abbott VI. For example, appellants argue that the regulations fail to codify the requirement for promulgation of preschool educational standards because the regulations merely state, in N.J.A.C. 6A:24-3.3(a)4, that a board "shall provide programs that meet the Department's Early Childhood Education Program Expectations" and are integrated with the WSR model utilized by the district. They contend that "there is no requirement, nor sufficient guidance, for the development and implementation of an age-appropriate curriculum for use in all preschool programs...." They argue that the Court's mandate to the Commissioner to develop substantive educational standards is "a far cry from expectations that are wholly undefined."
We reject appellants' arguments. First, the Court in Abbott VI acknowledged that the DOE had engaged an expert to assist in the development of a preschool curriculum to complement the SFA model and that draft standards had been prepared. Id. at 106-07, 748 A.2d 82. Thus, contrary to appellants' suggestion, neither the individual schools nor districts are expected to develop their own standards. Second, they rely on semantics to assail the "Expectations" program referred to in the regulation as "wholly undefined" without acknowledging that, as with the core curriculum standards, the actual standards described in "Expectations" are not encompassed in the regulations.
Appellants similarly attack the regulations as insufficient because, although they provide for the implementation of a "full-day, full-year early childhood program by the 2001-2002 school year," the regulations fail to define the term "full-day, full-year." Appellants fail to explain, however, why these terms need to be defined in the regulations, what that definition should be, or what problem, specifically, is created by a lack of an express definition.
Appellants allege that the amendments "fail to Codify the Requirements for Teacher Certification." In Abbott VI, the Court considered appellants' challenge to *439 the teacher certification standards that had been adopted by the Commissioner, which allowed DHS-licensed daycare providers, as opposed to those directly run by the school district, to hire teachers who held only an associate's degree, were uncertified at the time of hire, and were given six years to obtain a bachelor's degree and teacher's certification. Id. at 107-11, 748 A.2d 82. The Court affirmed the importance of teacher certification as a critical component of delivering high-quality programs to at-risk children, while recognizing the practical need to allow existing preschool teachers sufficient time to obtain bachelors' degrees and certification. Id. at 108-09, 748 A.2d 82. The Court directed that existing experienced teachers should be given four years to obtain certification and be evaluated each year to determine whether they would be retained. Id. at 111, 748 A.2d 82. It ordered that new hires, however, must be college graduates and obtain their preschool certification by September 2001. Id. at 111-12, 748 A.2d 82.
The Court also disapproved of the standard encompassed in the regulations' waiver provision that allowed a board to request a waiver when it wished to contract with a DHS-facility that was unable to meet the criteria for new hires. Id. at 109-10, 748 A.2d 82. The standard merely required the board to demonstrate that teachers with college degrees in early childhood education "are not available." Id. at 110, 748 A.2d 82. The Court directed the DOE to develop standards necessary for obtaining the waiver, such as demonstrating that advertisements were placed and colleges contacted. Id. at 112, 748 A.2d 82.
In the amended regulations, the DOE implemented the certification standards ordered by the Court. Existing teachers are required to obtain a bachelor's degree and certification by 2004; newly hired teachers are required to have a bachelor's degree and obtain certification by September 2001. N.J.A.C. 6A:24-3.3(b)3 and -3.3(b)4. The revised waiver provisions require the board to explain the circumstances that require the employment of the uncredentialed teacher; demonstrate the process used to attempt to secure a qualified individual; document notices and recruitment efforts; and identify all qualified individuals, if any, who applied for the position. N.J.A.C. 6A:24-3.3(c)1.
Appellants allege that, despite the inclusion in the amended regulations of the precise standards articulated by the Court, the regulations nonetheless "do not codify" the teacher certification requirements because "they fail to provide the standards and procedures that are necessary to ensure that districts can actually implement these requirements" pertaining to staff evaluation, possible additional funding and "extra support" to community based providers. Again, appellants do not state what those standards should be or why they are necessary. In our view, the amended regulations are clear, exact, and codify precisely the standards required by the Court's directive. A board can readily determine whether the standards are met.
Appellants make the blanket allegation that the amended regulations "Fail to Codify the Requirement for Maximum Class Size of 15." In Abbott VI, the Court rejected the prior regulations' provision that allowed DHS-licensed daycare providers to supply one teacher and one aide for every fifteen students, or one teacher and two aides for every twenty students. The State's plan submitted to Judge King had set preschool class size at fifteen students with one teacher and one aide. 163 N.J. at 112-13, 748 A.2d 82. The Court "reaffirm[ed] the requirement of one certified teacher for every fifteen preschool children." Id. at 114, 748 A.2d 82. The *440 amended regulations state: "The board shall provide one teacher and one aide for every 15 children. Class size shall not exceed 15 children." N.J.A.C. 6A:24-3.3(a)3. Thus, the regulations properly codify the Court's directive regarding class size.
Appellants also allege that the regulations provide
no standards to guide districts in assessing programs that presently do not meet this mandate; no guidance to providers in reducing their class sizes without reducing the overall number of children served and without eroding their funding base; and no procedures for districts to seek the additional staff, facilities, and funds necessary to comply in the 2000-2001 school year.
Appellants offer no basis for mandating the inclusion of such standards in a regulation regarding class size.
In some instances the claims are based on both mischaracterizing the specific regulations, and reading the regulations in isolation. For example, appellants allege that the regulations improperly "restrict[ ] districts to providing only `family referral services' for all school programs," rather than instituting programs based on actual needs. In fact, the regulation does no such thing. Rather than place any restrictions whatsoever on services, it merely requires that a "board shall ensure that family referral services are available for district-operated early childhood education programs and that family workers are provided by all DHS-licensed" programs. N.J.A.C. 6A:24-3.3(a)7. Nowhere does the regulation prevent a board from either instituting or applying for additional services based on need.
We are advised that there is presently pending before the Court a motion to enforce litigant's rights filed by the appellants, in which they claim that "the DOE has failed to take appropriate steps to assure the implementation of well-planned, high quality preschool in 2001-02." Abbott v. Burke, M-1131 (May 17, 2001). As we read appellants' brief in support of that motion, they are alleging that the DOE has not been diligent in implementing the mandates of Abbott V and Abbott VI respecting enrollment, Head Start, substantive educational content, teacher certification, facilities and funding, needs assessment and timely decision-making. The brief does not specifically challenge the validity of any of the DOE's preschool regulations, nor do they argue that the regulations are unconstitutional as applied.
It may be that the Court will revisit many of the issues addressed by us which relate to preschool education. For example, by interim order dated October 22, 2001, the Court has already addressed the timely decision-making issue as it applies to preschool programs. See page 437, 792 A.2d at 445 infra. However, our focus has been on addressing appellants' multiple claims that the regulations are unconstitutional because they fail to address the Abbott V and Abbott VI mandates. We resolve those issues without consideration of the fact-sensitive allegations raised by appellants in the enforcement action pending before the Court. We recognize that the Court may, in applying the facts contained in the voluminous record of the enforcement proceeding, find it necessary to require modification of the regulations challenged in this appeal. Nevertheless, our choice is to dispose of this matter now, recognizing that our conclusions respecting the validity of the challenged regulations may differ from the Court's findings in the preschool enforcement proceedings.
VI
FUNDING
Appellants argue that the regulations fail to codify a clear and effective funding *441 protocol because they: (1) do not acknowledge the State's constitutional obligation to assure adequate funding for all standards-based, supplemental and special needs programs; (2) do not codify the State's "clear commitment" that, if there is a need for additional funds, the needed funds will be "provided or secured" in accordance with Abbott V, supra, 153 N.J. at 518, 710 A.2d 450; (3) do not recognize the school's right to request additional funds "let alone codify standards" to effectuate that right; (4) fail to provide guidelines respecting how and when districts must reallocate resources for the purpose of implementing WSR; (5) fail to provide assurances that districts may seek and secure the additional funds within yearly district and State budget-cycles; (6) improperly utilized an illustrative budget; and (7) illegally authorized the DOE to deduct departmental administrative expenses from aid.
In our view, the laundry list of deficiencies advanced by appellants is insufficient to find a constitutional basis to invalidate the funding protocol adopted by the DOE. The foundation of the pertinent regulations, N.J.A.C. 6A:24-4.4 ([s]chool-based budgets) and N.J.A.C. 6A:24-7.1 ([a]pplication for additional State aid) is the use of zero-based budgeting. "[I]nstead of allocating certain funds to specific programs, the school uses the entirety of its funds to implement whole-school reform." Abbott V, supra, 153 N.J. at 498, 710 A.2d 450. Abbott V directs that not only must sufficient funds be provided for whole-school reform and for the additional or modified supplemental programs that are constituent parts of such reform, but there must also be in place "a clear and effective funding protocol." Id. at 518, 710 A.2d 450. Consequently, "[c]onsistent with zero-based budgeting, the Commissioner may, before seeking new appropriations, first determine whether funds within an existing school budget are sufficient to meet a school's request for a demonstrably needed supplemental program." Ibid. The basis for whole-school reform is a "clear commitment that if there is a need for additional funds, the needed funds will be provided or secured." Ibid.
We are satisfied that the regulatory scheme satisfies the Abbott V mandate. N.J.A.C. 6A:24-4.4 establishes the framework for the presentation and approval of school-based budgets. The principal consults with staff and the SMTs respecting the programs necessary to implement the selected WSR model. He or she then prepares a budget proposal which compares the proposed budget to both the current year appropriations and to either the illustrative budget designed by the Commissioner for the selected WSR or the components of a proposed budget for an alternative program design. N.J.A.C. 6A:24-4.4(a)1 and -4.4(a)2.
When expenditures exceed the illustrative budget standards, the principal identifies those standards that are exceeded and the SMT prepares a demonstration of particularized need for each category that exceeds the illustrative budget for approval by the DOE. N.J.A.C. 6A:24-4.4(a)3. During the budgeting process, the principal seeks "input from the SMT on the proposed school-based budget." N.J.A.C. 6A:24-4.4(d). Ultimately, the principal submits the approved budget to the DOE, and upon approval of the budget by the Commissioner, the Board allocates adequate funds in the district budget for those elements approved by the Commissioner, and it may allocate additional funds for those elements not approved by the Commissioner, provided the Board does not apply for additional State aid. N.J.A.C. 6A:24-4.4(b) through -4.4(h).
N.J.A.C. 6A:24-7.1 provides the framework for application for additional State *442 aid. It states that "[w]hen necessary, for the application for additional State aid pursuant to the requirements of this subchapter, a board shall submit an application for additional Abbott v. Burke State aid in a format prescribed by the Commissioner as part of the original district-wide budget...." N.J.A.C. 6A:24-7.1(a). The board's application shall include a "demonstration that resources are insufficient to support all programs required by Abbott V or Abbott VI, and further reallocation would weaken the district's foundational educational programs...." N.J.A.C. 6A:24-7.1(b). This regulation is in keeping with the Court's observation that "[c]onsistent with zero-based budgeting, the Commissioner may before seeking new appropriations, first determine whether funds within an existing school budget are sufficient to meet a school's request for a demonstrably needed supplemental program." Abbott V, supra, 153 N.J. at 518, 710 A.2d 450.
The regulations provide a process whereby the district's fiscal needs are prioritized, in reverse order, in order for the district to articulate in its application the district's priorities from a fiscal perspective. N.J.A.C. 6A:24-7.1(c). Notably, this "reverse prioritization shall not result in elimination of Court-ordered requirements, but ensures that all funding and concomitant programs and services effectively and efficiently improve student achievement." N.J.A.C. 6A:24-7.1(c). The regulations provide standards by which the DOE shall review applications for additional funds, and further permit a district to apply for additional resources during the school year to implement the DOE-approved programs, services and other expenditures due to unanticipated or unforeseen circumstances. N.J.A.C. 6A:24-7.1(f).
We reject appellants' and amicus` argument that the "illustrative" budget intrudes upon the discretionary powers of principals and SMTs to prepare individual annual budgets. As the DOE explains, the illustrative budget device is designed as a "guidance tool" and nothing more; it is "helpful to assess consistency in the implementation of whole school reform models among all schools and districts. It also assists the Commissioner to meet the directive of the Courtto ensure effective and efficient administration of the program." The DOE adds:
When the school's budget is compared to the illustrative budget, the SMT can assess if required positions or other items are missing or if the school budget contains expenditures not required by the model or the Department. At that time, the school budget can be amended to include the missing expenditures or the SMT may apply for a particularized need thereby allowing the SMT to exercise its discretion to determine the positions and services that are needed at the school.
As such, we do not view the illustrative budget as trumping the deference properly accorded to local officials and the SMTs.
We also do not agree with the appellants that the regulatory framework violates Abbott V 's mandate for parity funding. We do not view the regulations as in any way impeding the Commissioner's charged obligation to provide or secure funding necessary to implement programs demonstrated to be needed by the Abbott districts. Ultimately, experience will demonstrate whether the mechanism adopted by the DOE in fact impairs the funding process. The DOE advises us that "many of [the] issues have been resolved by the amendment of the regulations and in practice." As noted, it points out that in the second year of the funding process the DOE in fact received nineteen *443 requests for additional State aid and awarded aid to seventeen districts.
Finally, we reject appellants' and amicus' argument that permitting the Commissioner to deduct from an Abbott district's State aid funds necessary to manage and supervise implementation of the State aid program is unconstitutional. See N.J.A.C. 6A:24-1.4(m). Abbott IV, supra, 149 N.J. at 189, 693 A.2d 417, held that Abbott districts must receive increased funding on a "parity" with the budgeted expenditures of the affluent school districts. See also Abbott V, supra, 153 N.J. at 498, 710 A.2d 450 (same). Although the Court made no mention of deductions for departmental administrative costs, in ordering parity funding, it directed that the increased funding remedy "also shall include the implementation of administrative measures that will assure that all regular education expenditures are correctly and efficiently used and applied to maximize educational benefits." Abbott IV, supra, 149 N.J. at 189, 693 A.2d 417. In our view, it is not unreasonable for the DOE to provide for a deduction of the nominal sum to cover reasonable administrative measures in a manner that bears a direct relation with the amount of funds expended. Moreover, as the DOE points out, if the district is concerned that the two percent deduction for administrative fees will leave the district without sufficient funding to implement whole-school reform, it may seek additional State aid pursuant to N.J.A.C. 6A:24-7.1.
VII
WAIVER
Appellants argue that the regulations improperly permit districts to waive any of the Abbott remedial measures. They claim that the DOE lacks the authority to allow the waivers because the Abbott measures must be implemented to assure a constitutional education. They assert that the regulations' incorporation of the waiver provisions of N.J.A.C. 6A:5 "does absolutely nothing to cure this grave constitutional defect," and that "waivers can only be granted where necessary to facilitate full and complete implementation of the Abbott mandates, or where more time for implementation is needed and the basis for such temporary relaxation is documented and justified." Appellants' argument has no merit.
The regulations provide: "The board shall seek from the Commissioner such equivalency or waiver determinations in accordance with N.J.A.C. 6A:5 as are necessary to permit it to implement required or approved programs in an efficient and effective manner, or to effectuate necessary reallocations." N.J.A.C. 6A:24-1.4(e). Thus, contrary to appellants' suggestion that the regulations permit wholesale, unsubstantiated waiver of a school's or district's obligation to implement Abbott programs, waivers are permitted only where necessary to accomplish the proper implementation of programs. The waiver provision in the regulations does not violate the directives of Abbott. We therefore reject appellants' claims that the waiver provisions in the regulations are unconstitutional.
VIII
ACCOUNTABILITY MEASURES AND APPEAL PROVISIONS
Appellants contend in their supplemental brief that the amended regulations violate Abbott V because they fail to contain the definitions, procedures or standards for implementing a district accountability system and fail to codify the Court's mandate in Abbott VI that the appeals process be "expedited" so that disputed programs *444 may be implemented in the relevant school year.
In Abbott V, supra, 153 N.J. at 517, 710 A.2d 450, the Court directed the Commissioner "to authorize accountability programs, as may be deemed necessary or appropriate, and to coordinate them with whole-school reform." It provided no further direction as to the content of the accountability measures.
The regulations provide in N.J.A.C. 6A:24-1.5:
Each district and school shall implement its approved district wide system of rewards to recognize schools, teachers, parents, and administrators who contribute to helping students attain the Core Curriculum Content Standards pursuant to a district plan approved by the Department. In districts and/or schools that do not maintain a pattern of improved student achievement, the Department shall pursue sanctions provided for in N.J.S.A. 18A:7F-6(b).
This regulation provides no broad overall program of accountability, but provisions for accountability are woven throughout the Abbott regulations. For example, the regulations provide for SRI teams, made up of DOE staff members, to be assigned to each school, who will be responsible for assuring accountability as well as assisting and facilitating the SMTs. N.J.A.C. 6A:24-1.3(a); 31 N.J.R. at 2925. In addition, plans for WSR programs must be submitted annually by December 1, N.J.A.C. 6A:24-4.3, and the principal or developer must bring to the attention of the DOE "any school not demonstrating satisfactory progress in student achievement...." N.J.A.C. 6A:24-4.5(b). In those instances, the SRI team, the developer, and the SMT must develop a corrective action plan that includes a timeline and benchmarks for improving achievement. Ibid. Thus, rather than implementing an overall accountability plan, the regulations seek to incorporate accountability throughout the process. The DOE's approach does not violate Abbott V. Implementation of the Abbott scheme is in its early stages, and the Court's direction cannot be understood as a mandate that the Commissioner develop a detailed, state-wide accountability program prior to actual experience with the unique circumstances presented in the implementation process.
In Abbott V, supra, 153 N.J. at 526-27, 710 A.2d 450, the Court set forth the process to be used to resolve disputes pertaining to the reforms it ordered:
We recognize that disputes will occur in the administration of public education in the era ushered in by these reforms. Those disputes will involve issues arising from the implementation, extension, or modification of existing programs, the need for additional supplemental programs, the allocation of budgeted funds, the need for additional funding, and the implementation of the standards and plans for the provision of capital improvements and related educational facilities. Such disputes shall be considered "controversies" arising under the School Laws. N.J.S.A. 18A:7A-1 to 7F-34. Based on a showing of demonstrated need, schools or school districts may apply to the DOE for authorization to improve or amend existing programs, to adopt additional supplemental programs, to build or to renovate facilities, and to seek the necessary funding. An aggrieved applicant may appeal to the Commissioner from an adverse decision on any such application made to the DOE. If the dispute is not resolved or if the applicant is not satisfied with the disposition, the case may be transferred under the Administrative Procedure Act to the Office of *445 Administrative Law as a contested case. See N.J.S.A. 52:14B-1 to -15; N.J.A.C. 1:1-1.1 to -19.2. After conducting a hearing, the Administrative Law Judge will make a recommendation, which the Commissioner may, in his discretion, accept or reject. Either party may then appeal to the State Board of Education. The Board's determination will constitute a final agency determination that may then be appealed to the Appellate Division and, ultimately, to this Court. In this way, districts and individual schools will be accorded full administrative and judicial protection in seeking the demonstrably-needed programs, facilities, and funding necessary to provide the level of education required by CEIFA and the Constitution.
The regulations provide for an appeals process that generally must meet the requirements for petitions of appeal as set forth in N.J.A.C. 6A:3. N.J.A.C. 6A:24-9.1 to -9.6. Appellants claim that, while appeals to the Commissioner must be filed within thirty days of the contested decision, the regulations fail to provide time limits for the Commissioner's decision. They contend that Abbott VI "mandate[s] that final agency dispositions be rendered in time for implementation of the controverted programs and reforms during the relevant school year."
Contrary to appellants' claims, the Court's remarks in Abbott VI concerned only disputes pertaining to the early childhood programs. Abbott VI, supra, 163 N.J. at 120, 748 A.2d 82. It recognized that its opinion would affect both proceedings pending in the OAL, and disputes that would arise from the revision of plans that had been submitted. Ibid. It stated: "Those disputes now pending, and those filed in response to DOE action in respect of revised plans, must be expedited in the OAL to the end that final dispositions are issued in time for implementation in the 2000-2001 school year." Ibid. Although the Court was presented with the opportunity to mandate a procedure whereby all disputes must be resolved prior to the relevant school year, it did not do so.
Recently, in appellants' action to enforce litigant's rights, Abbott v. Burke, Docket 42,170 (filed May 17, 2001), the Court again considered the decision-making issue in the context of preschool education. By order dated October 22, 2001, subject to its final opinion in the matter, the Court set a time frame for administrative decision-making and appeals "to ensure that final dispositions are issued in time for the 2002-2003 school year." The Court then established an expedited schedule for submission, review and appeal of Abbott districts preschool programs and budgets. We assume that the Court may address the necessity for appropriate amendments to the present regulations as they pertain to appeals from decisions affecting preschool programs and budgets when its final decision in Abbott VII is rendered. However, we decline to declare invalid the decision making and appellate process as presently structured by the regulations as they apply to issues other than the issues relating to preschool programs and budgets. The present rules have already expedited the process. An appeal must be filed within thirty days of the challenged decision. N.J.A.C. 6A:24-9.2(a)1. An answer must be filed within twenty days of the date the petition is received, N.J.A.C. 6A:24-9.3(a)1. The Commissioner either decides the matter or transmits the matter to the OAL "on an expedited basis to resolve material factual disputes." N.J.A.C. 6A:24-9.6(a). It may be impossible, because of the timing of this appeal, for the Commissioner to render his decision in time for implementation of the controverted program and reform during the relevant school year. In our view, if time and experience demonstrate that the appeal process is undermining *446 the reform goals and mandates of the Court in Abbott V and Abbott VI, the appeal regulations should be revisited by the DOE.
Appellants further argue that the regulations are deficient because individual students are not "aggrieved applicants" having standing to appeal DOE decisions or applications for programing or funding. See N.J.A.C. 6A:24-9.1. Although the DOE concedes that this is correct, it also points out that "[i]t is permissible, however, for a petition to be filed on the students' behalf consistent with regulatory process established for the filing of a petition of appeal with the Commissioner" under N.J.A.C. 6A:3-1.3. We understand this concession to mean that Abbott district children or families individually or through their class representatives may be "aggrieved" parties in matters involving Abbott implementation, and thus have the full panoply of appeal remedies afforded to the Abbott districts.
Finally, we find no constitutional infirmity in the manner by which N.J.A.C. 6A:24-9.6(c) establishes the traditional standard of review and places the burden of proof upon the "petitioning party to demonstrate that those standards were met by the applicant notwithstanding the DOE's determination to the contrary." We do not read Abbott V as mandating a contrary standard of review or a burden shifting to the DOE to justify its actions. Of course, in rendering its decision, the DOE must give deference to the local board's decision with the understanding that "the local educators are in the best position to know the particularized needs of their own students." Abbott V, supra, 153 N.J. at 522-23, 710 A.2d 450.
In sum, we reject appellants' claims that the amended regulations violate Abbott V because they fail to specifically codify an accountability system and fail to codify an "expedited" appeals process.
IX
CHARTER SCHOOLS
Appellants argue that the regulations are unconstitutional because they exclude from the definition of "Abbott district" the children who attend charter schools located within such districts. See N.J.A.C. 6A:24-1.2 ("Abbott district shall not include a charter school located within any of [the twenty-eight designated] districts"). Appellants' brief provides only a two-page cursory discussion on this issue, and amicus does not discuss it at all in its brief. In any event, we reject the contention.
In In re Grant of Charter School Application, 164 N.J. 316, 319, 753 A.2d 687 (2000), the Court reviewed the history of the charter school movement and addressed various issues including the potential racial and economic impact resulting from the Legislature's enactment of the Charter School Program Act of 1995, N.J.S.A. 18A:36A-1 to -18 (Charter School Act). Specifically, various local boards of education were concerned that the loss of funds to charter schools, see N.J.S.A. 18A:36A-12, will cause them to "cease providing a thorough and efficient education to [their] remaining pupils." In re Grant of Charter School Application, supra, 164 N.J. at 331, 753 A.2d 687. The Court did not, however, address whether charter schools themselves are entitled to the same financial benefits as Abbott districts.
By enacting the Charter School Act, the Legislature authorized "an alternative format, different from the traditional local school district model and known generally as charter schools, for providing public education to New Jersey children." Id. at 319, 753 A.2d 687. Charter schools are *447 public schools operated under a charter granted by the Commissioner, and managed by a private board of trustees independently of the local board of education. N.J.S.A. 18A:36A-3a. As such, charter schools necessarily function outside the regulatory framework applicable to public schools, including schools in Abbott districts. However, charter school students must meet the same testing and academic performance standards imposed for other public school students. N.J.S.A. 18A:36A-5d. Under the Act, a discrete funding mechanism is in place. The district of residence of a charter school forwards to the school a per pupil amount equal to the lower of either 90% of the program budget per pupil or "90% of the maximum T & E amount."[4]N.J.S.A. 18A:36A-12b.
Extending Abbott's fiscal benefits to charter schools would necessarily impose upon those schools the corollary demanding regulatory framework governing Abbott districts. In our view, such a result would subvert the goals of the Charter School Act. The underpinning to the charter school movement was to foster "an alternative vision for schooling" and "the desire to serve a special population-often students considered to be `at risk'-and the desire to gain autonomy from State or district regulation." In re Grant of Charter School Application, supra, 164 N.J. at 321, 753 A.2d 687 (quoting U.S. Dep't of Educ., The State Charter Schools 2000: Fourth-Year Report at 42 (Jan.2000)). By enacting the Charter School Act, the Legislature codified these goals:
The Legislature finds and declares that the establishment of charter schools as part of this State's program of public education can assist in promoting comprehensive educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom. Specifically, charter schools offer the potential to improve pupil learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of learning outcomes; make the school the unit for educational improvement; and establish new professional opportunities for teachers.
[N.J.S.A. 18A:36A-2.]
Imposing Abbott's regulatory standards would, in our view, erode the schools' autonomy and flexibility to offer "innovative learning methods" and "educational choices" and their ability to "establish a new form of accountability for schools." Ibid.
Moreover, the necessity for imposing the Abbott remedies was the sixteen-year history of "chronic failure" of local districts to attain the statewide academic standards. See Abbott V, supra, 153 N.J. at 500, 710 A.2d 450 (citing Judge King's findings on remand). At least, at this point, the history of the charter school experiment has not demonstrated such a pervasive failure. In any event, the Commissioner is empowered to assess on an annual basis whether a charter school is meeting the goals of its charter and "shall *448 conduct a comprehensive review prior to granting a renewal of the charter." N.J.S.A. 18A:36A-16a. In addition, a charter may be revoked "if the school has not fulfilled any condition imposed by the commissioner in connection with the granting of the charter or if the school has violated any provision of its charter." N.J.S.A. 18A:36A-17. Such a failure may include a charter school's students' inability to meet the same testing and academic performance standards imposed for other public schools. See N.J.S.A. 18A:36A-5d. Consequently, unlike Abbott school districts, a charter school will simply cease operating if the Commissioner vacates the charter.
Finally, it is our view that the charter school concept does not fit within the Abbott school construct simply because it is an optional program available to parents and students who opt not to accept the advantages and remedial measures placed upon the Abbott school districts. They make this voluntary choice because they wish to participate in a program offering the "potential to improve pupil learning." N.J.S.A. 18A:36A-2. Unlike the parents of students enrolled in traditional Abbott school districts, parents of charter school students may, at any time, exercise the option of withdrawing from the charter school if they wish to benefit from the Abbott remedial measures.
We conclude that exclusion of charter schools from the definition of Abbott districts does not render the regulations unconstitutional.
X
For the reasons expressed in our opinion, we reject appellants' contention that we should retain jurisdiction in this matter.
We affirm the DOE's adoption of the regulations promulgated pursuant to Abbott V and Abbott VI, with the exception of N.J.A.C. 6A:24-1.4(i) and -4.1(i)7, pertaining to security programs, and N.J.A.C. 6A:24-4.2(c)8, pertaining to the position of WSR facilitator. Those regulations are remanded for the DOE's promulgation and adoption of new or amended regulations that will comply with the Court's directives in Abbott V.
Affirmed.
NOTES
[1] Subsequent to the filing of this appeal, Subchapter 8 was repealed, and its provisions incorporated into N.J.A.C. 6A:26-1.1 to -17.1, effective October 1, 2001. 33 N.J.R. 3482, 3482-518 (October 1, 2001).
[2] The preschool regulations are addressed later in the opinion. See page 424-25, 792 A.2d at 438 infra.
[3] In Abbott V, supra, the Court examined the issues of construction standards for facilities in Abbott districts. 153 N.J. at 519-27, 710 A.2d 450. The Court directed the immediate completion by each district of a Five Year Facilities Management Plan, and recommended the Legislature to empower the Educational Facility Authority to act as construction manager for all projects to finance construction through bond. Id. at 521-23, 710 A.2d 450. In Abbott v. Burke, 164 N.J. 84, 751 A.2d 1032 (2000) (Abbott VII), the Court clarified its opinion in Abbott V by stating that the State was required to fund all costs of necessary facilities, remediation and construction.
[4] N.J.S.A. 18A:36A-12a defines "[m]aximum T & E amount" as "the T & E amount plus the T & E flexible amount for the budget year weighted for kindergarten, elementary, middle school and high school respectively as set forth in section 12 of P.L.1996, c. 138 (C.18A:7F-12)." N.J.S.A. 18A:7F-12 authorizes the Commissioner to establish a "basic per pupil T & E amount."