2 A.3d 387 (2010)
415 N.J. Super. 375
J.D., by his mother Trisha SCIPIO-DERRICK; J.G., by her guardian Marcelle Gregory-Beck; J.C., by his mother Latonya Colson; D.C., by her mother Latonya Colson, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,
v.
Lucille DAVY, Commissioner of the New Jersey Department of Education, in her official capacity; Stuart Rabner, New Jersey Attorney General, in his official capacity; Bradley Abelow, Treasurer of the State of New Jersey, in his official capacity; Yut'se Thomas, Assistant Commissioner of the New Jersey Department of Education, Finance Division, in her official capacity, Scott Weiner, Chief Executive Officer, New Jersey Schools Construction Corporation, in his official capacity, Defendants-Respondents.
No. A-1375-08T2.
Superior Court of New Jersey, Appellate Division.
Argued May 3, 2010.
Decided July 16, 2010.
*388 Avidan Y. Cover argued the cause for appellants (Seton Hall Law School Center for Social Justice, attorneys; Mr. Cover and Emily B. Goldberg, Newark, on the briefs).
Shannon M. Ryan, Deputy Attorney General, argued the cause for respondents (Paula T. Dow, Attorney General, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Michelle Lyn Miller, Senior Deputy Attorney General, on the brief).
Before Judges LISA, BAXTER and COBURN.
The opinion of the court was delivered by
LISA, P.J.A.D.
Plaintiffs, four students attending two Newark Charter Schools, brought this putative class action on behalf of the approximately 3100 Newark children attending charter schools. They contended that provisions in the Educational Facilities Construction and Financing Act (EFCFA), N.J.S.A. 18A:7G-1 to -48, and the Charter School Program Act of 1995 (CSPA), N.J.S.A. 18A:36A-1 to -18, that govern state funding for charter schools violate their equal protection rights under the New Jersey Constitution, N.J. Const. art. I, ¶ 1, because charter schools receive only ninety percent of the per pupil funding provided to traditional public schools, N.J.S.A. 18A:36A-12, and charter schools are excluded from receiving any state or local funding for facilities under the provisions of EFCFA, see N.J.S.A. 18A:7G-3, and the CSPA, see N.J.S.A. 18A:36A-10. Newark is a former Abbott district, now known as an SDA district under the EFCFA. As such, Newark's traditional public schools receive one hundred percent facilities funding. N.J.S.A. 18A:7G-5k. All non-SDA districts in the State receive at least forty percent facilities funding for their traditional public schools.[1]Ibid.
*389 Plaintiffs contended that these statutory provisions, either individually or in combination, unlawfully discriminate against them. They alleged that they are "educated with a mere fraction of the per-pupil funding available to similarly-situated NPS [Newark Public School] students." They also alleged that they are similarly situated to their friends and neighbors who attend traditional Newark public schools and that they face the same unique educational challenges as their peers in a poor urban district and "are at a higher risk of school failure because of problems related to poverty including inadequate housing, violence, crime, substance abuse, teenage pregnancy, and parenthood." (citing Abbott v. Burke, 153 N.J. 480, 562, 710 A.2d 450 (1998) (Abbott V)). They therefore contended that the aggregate impact of the funding scheme "frustrates the ability of [plaintiffs'] schools to meet [their] unique educational needs."
Plaintiffs sought a declaration that N.J.S.A. 18A:36A-10 (barring charter schools from receiving state or local funding for facilities) and N.J.S.A. 18A:36A-12 (providing ninety percent per pupil funding for operational costs), individually or in combination, violate Article 1, Paragraph 1 of the New Jersey Constitution.[2] Plaintiffs also sought to "enjoin Defendants to design public charter school funding provisions that do not violate the equal-protection guarantee of the New Jersey Constitution."
Defendants responded to the complaint with a motion to dismiss for failure to state a claim upon which relief can be granted. See R. 4:6-2(e). The judge granted the motion and dismissed the complaint with prejudice. The judge was of the view that, in accordance with established precedents, equal protection analysis is not applicable to school funding issues and, alternatively, even if it were, plaintiffs' complaint failed to set forth a viable equal protection challenge. For the reasons that follow, we affirm.

I
Some background discussion regarding the nature and operation of charter schools in New Jersey is necessary to our analysis of the issues before us. With the enactment in 1995 of the CSPA, charter schools became an option for public education in New Jersey. The Legislature declared it the public policy of New Jersey to encourage and facilitate the development of charter schools. N.J.S.A. 18A:36A-2. The Legislature found that the establishment of charter schools would assist in education reform by providing educational approaches not available in traditional public schools. Ibid. Specifically, charter schools
offer the potential to improve pupil learning; increase for students and parents the educational choices available when selecting the learning environment which they feel may be the most appropriate; encourage the use of different and innovative learning methods; establish a new form of accountability for schools; require the measurement of *390 learning outcomes; make the school the unit for educational improvement; and establish new professional opportunities for teachers.
[Ibid.]
A charter school is a public school, which is operated under a charter granted by the Commissioner of Education (Commissioner). N.J.S.A. 18A:36A-3a. Charter schools are operated independently of local boards of education and are managed by a board of trustees, who are deemed public agents authorized by the State Board of Education to supervise and control the charter school. Ibid. The board of a charter school must comply with the provisions of the Open Public Meetings Act. N.J.S.A. 18A:36A-6.
A charter school may be established by teachers, parents with children attending school in the district, a combination thereof, an institution of higher education, or a private entity. N.J.S.A. 18A:36A-4a. Additionally, a currently existing public school may become a charter school if more than half the teachers and parents of the school sign a petition. N.J.S.A. 18A:36A-4b. An application must be filed stating, among other things, the curriculum to be offered and the methods of assessing whether students are meeting educational goals. N.J.S.A. 18A:36A-5d.
Unlike traditional public schools and school districts, charter schools are authorized to accept gifts or grants for school purposes. N.J.S.A. 18A:36A-6g. They can also receive federal funds. N.J.S.A. 18A:36A-10. A charter school has all the powers necessary or desirable for carrying out the provisions of its charter, including the acquiring of real property for use as a school facility from public or private sources by purchase, lease or gift. N.J.S.A. 18A:36A-6c.
The application process is extensive and rigorous. The application must include a financial plan. N.J.S.A. 18A:36A-5l. That plan, of course, must be formulated within the funding parameters providing for ninety percent per pupil operational funding and no facilities funding. The applicable regulations establish a two-step process for the application. N.J.A.C. 6A:11-2.1. In the first step, the applicant must "include a description of the informational items listed in N.J.S.A. 18A:36A-5 and a description of how those items relate to such matters as the charter school mission, objectives, special populations, and transportation needs." In re Grant of Charter Sch. Application, 164 N.J. 316, 337, 753 A.2d 687 (2000) (citing N.J.A.C. 6A:11-2.1(b)1). If the applicant receives preliminary approval based upon that information, the applicant then must submit additional information, such as "identification of its facility and lease, mortgages or title to its facility, a certificate of occupancy by the appropriate local official, a sanitary inspection report and a fire inspection certificate." Ibid. (citing N.J.A.C. 6A:11-2.1(g)3 to 6). Within those parameters, the financial plan must satisfy the Commissioner that the charter school can adequately serve the educational needs of the prospective students. Those students are required to meet the same testing and academic performance standards that pertain to traditional public school students, and they must also meet any additional assessment indicators which are included within the charter approved by the Commissioner. N.J.S.A. 18A:36A-5d.
Charter schools are open to all students on a space available basis. N.J.S.A. 18A:36A-7. While the school may not discriminate in its admissions policies, it may limit admission to a particular grade level or area of concentration such as math or science. Ibid. The school may not charge tuition to students residing in the school district and enrollment preference must be *391 given to district residents. N.J.S.A. 18A:36A-8a.
Enrollment in a charter school is completely voluntary, and a student may withdraw from a charter school at any time and enroll in a traditional public school. N.J.S.A. 18A:36A-9. A charter school may be located in any suitable location, including in a portion of an existing public school building. N.J.S.A. 18A:36A-10. The facility is exempt from public school facility regulations, except those pertaining to the health or safety of students. Ibid. While the charter school must operate in accordance with its charter and the laws governing traditional public schools, the Commissioner upon request of the charter school may exempt the charter school from all state regulations concerning public schools except those regarding assessment, testing, civil rights, and student health and safety. N.J.S.A. 18A:36A-11a. Moreover, the board of trustees of the charter school has the "authority to decide matters related to the operations of the school including budgeting, curriculum, and operating procedures." N.J.S.A. 18A:36A-14a.
Once finally approved, an initial charter is for a term of four years. N.J.S.A. 18A:36A-17. Thereafter, renewals are for five year terms. Ibid. However, during the operation of a charter school, the Commissioner is required to "annually assess whether each charter school is meeting the goals of its charter, and shall conduct a comprehensive review prior to granting a renewal of the charter." N.J.S.A. 18A:36A-16a. The county superintendent of schools is provided ongoing access to the records and facilities of charter schools within that county to ensure that each charter school complies with its charter and with all applicable regulations regarding assessment, testing, civil rights, and student health and safety. Ibid. Each charter school is required to submit an annual report to the local board of education, the county superintendent, and the Commissioner, which is used to facilitate the Commissioner's annual review. N.J.S.A. 18A:36A-16b.
If not satisfied that a charter school has fulfilled any condition of its charter, or if it has violated any provision of its charter, the Commissioner may revoke the charter at any time. N.J.S.A. 18A:36A-17. The Commissioner may also place a charter school on probationary status to allow implementation of a remedial plan, and if implementation of that plan is unsuccessful, the charter may then be summarily revoked. Ibid. And, of course, the Commissioner can decline to renew a charter.
This brings us to the statutory provisions that plaintiffs contend deprive them of equal protection. Under the CSPA, "[a] charter school shall not construct a facility with public funds other than federal funds." N.J.S.A. 18A:36A-10. And, the EFCFA, which provides the funding mechanism for school facilities construction, does not include a provision for charter schools. See N.J.S.A. 18A:7G-3 (which does not include charter schools within the definition section of the EFCFA). Therefore, neither state nor local public funds can be used by charter schools for facilities purposes. For operations, charter schools are funded on a per pupil basis of ninety percent of the funding applicable to traditional public schools within the district.[3]
*392 Plaintiffs contend that, because of this disparity in funding, charter schools find it necessary to dip into their operational funds to pay facilities costs. As a result, they contend that the net effect of these combined provisions, based upon a 2001 Department of Education study, "further reduced the amount of state funding available to public charter schools from 90 percent to approximately 65 to 70 percent of the program budget." Plaintiffs emphasize that even the wealthiest school districts in New Jersey receive at least forty percent of eligible costs for facilities purposes. N.J.S.A. 18A:7G-5k. And, of course, the former Abbott districts, including Newark, receive one hundred percent of eligible facilities costs. Ibid.

II
In their complaint, plaintiffs alleged these funding disparities. They also alleged that they are similarly situated in all relevant respects to their friends and neighbors in Newark who attend traditional Newark public schools. Plaintiffs did not allege that they are not receiving a thorough and efficient education in their charter schools. At best, they allege that the absence of facilities funding "negatively affects Plaintiffs' education by forcing their schools to divert funds from educational services to lease, maintenance, and other facilities costs;" that the ninety percent operational funding "negatively affects Plaintiffs' education by further reducing the funds available to meet the unique educational challenges produced by urban poverty;" and that the aggregate effect of these provisions (including the no longer applicable absence of Abbott funding for supplemental and parity aid) "is to create a stark disparity in funding that negatively affects Plaintiffs' education."

III
Plaintiffs argue that the trial judge erred in dismissing their complaint with prejudice. They first contend that it was error for the judge to conclude that equal protection analysis was not applicable. Plaintiffs argue that in Robinson v. Cahill, 62 N.J. 473, 303 A.2d 273 (Robinson I), cert. denied, sub nom. Dickey v. Robinson, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973), and Abbott v. Burke, 119 N.J. 287, 575 A.2d 359 (1990) (Abbott II), the Court did not preclude equal protection challenges to education funding laws. In those cases, the Court rejected the asserted equal protection claims, and instead decided the cases under our state constitution's "thorough and efficient" (T & E) education clause, which provides: "The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years." N.J. Const. art. VIII, § 4, ¶ 1. Plaintiffs contend *393 that those cases merely stand for the proposition that when both equal protection and T & E challenges are made to education funding laws, it is preferable to decide the case on the latter basis.
Plaintiffs also distinguish Robinson I and Abbott II by noting that the inequalities involved in those cases were based on local property values or the taxing and spending decisions of local school districts, whereas the statutes in this case "demand unequal expenditures per pupil." Moreover, the statutes in this case result in disparities among students in the same district, rather than among students in different districts.
Plaintiffs contend that the total absence of facilities funding for charter schools constitutes a "categorical denial of a government service to a discrete group, despite the fact that the service is provided to other similarly situated persons [i.e. traditional public school students]." Accordingly, plaintiffs argue that their equal protection claim is viable, notwithstanding Robinson I and Abbott II, because it alleges the denial of access to a government service (facilities funding) rather than inequitable education funding levels. Plaintiffs further contend that the ninety percent provision presents a viable equal protection claim because it is "not the result of any municipality's tax capacities or decisions, but is a statutory fiat by the State, which requires drastically unequal expenditures per pupil for Newark public charter school students."
Thus, plaintiffs contend that deciding this case on equal protection grounds will not run afoul of the reason expressed by the Court in Robinson I for not applying the equal protection clause in this context, namely, "that the equal protection clause may be unmanageable if it is called upon to supply categorical answers in the vast area of human needs, choosing those which must be met and a single basis upon which the State must act." Robinson I, supra, 62 N.J. at 492, 303 A.2d 273.
Finally, plaintiffs argue that the implicated statutes are not supported by a legitimate state interest, and even if such an interest could be identified, the statutes would nevertheless be unconstitutional because they do not further the interest, but rather undermine the State's declared public policy of encouraging and facilitating charter schools. Quoting Abbott v. Burke, 100 N.J. 269, 296, 495 A.2d 376 (1985) (Abbott I), plaintiffs contend that even if their T & E rights are not burdened by these statutes, an equal protection claim is viable where "plaintiffs suffer educational inequities ... that ... derive, in significant part, from the funding provisions[,] [and] ... even if all children receive a minimally thorough and efficient education, the financing scheme engenders more inequality than is required by any other State interest."
Although not asserting a T & E claim as such, plaintiffs argue that their T & E rights are indirectly affected by the funding disparities because it is well recognized that with less money per pupil overall, the quality of education is likely to be diminished. They argue that, considering the very low threshold for surviving a Rule 4:6-2(e) motion, the judge should have allowed them to conduct discovery. Alternatively in that regard, they argue that the judge should not have dismissed their complaint with prejudice.

IV
In construing the right to equal protection implied in Article I, Paragraph 1 of the New Jersey Constitution, our Supreme Court has determined not to follow the multi-tier federal equal protection analysis (strict scrutiny, intermediate scrutiny, *394 rational basis), but instead to employ a balancing test which considers "the nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Greenberg v. Kimmelman, 99 N.J. 552, 567, 494 A.2d 294 (1985). "When a statute is challenged on the ground that it does not apply evenhandedly to similarly situated people, our equal protection jurisprudence requires that the legislation, in distinguishing between two classes of people, bear a substantial relationship to a legitimate governmental purpose." Lewis v. Harris, 188 N.J. 415, 443, 908 A.2d 196 (2006).
Our threshold determination is whether equal protection analysis is properly applicable to the statutes challenged here. In Robinson I, the challenge was to the statutory scheme of funding public education by which sixty-seven percent was paid by local taxes, twenty-eight percent by the State, and the remaining five percent by the federal government. Robinson I, supra, 62 N.J. at 480, 303 A.2d 273. Because public schools were funded primarily by local taxes, schools in property-poor districts received less per pupil funding than those in wealthy districts. Id. at 481, 303 A.2d 273. The plaintiffs challenged the statutes on both equal protection and T & E grounds.
The Court said it was "clear that there is a significant connection between the sums expended and the quality of the educational opportunity." Ibid. However, the Court went to great lengths to explain that equal protection was not the proper vehicle for addressing the education funding inequities, because such analysis may be unmanageable in light of the many services the State must provide and the many needs it must fulfill, as a result of which it would be inadvisable for a judicial determination of which services government should be compelled to provide and which needs it should fulfill and a single basis upon which it must act. Id. at 492, 303 A.2d 273. Expenditures among municipalities would inevitably vary as a consequence of varying revenues raised by local taxation among the municipalities. Id. at 494, 303 A.2d 273. The Court said it "will not pursue the equal protection issue in the limited context of public education." Id. at 500, 303 A.2d 273. The Court went on to hold that the then-current funding system violated the T & E clause, on the limited record then before it, based on disparities in expenditures per student among the municipalities. Id. at 515, 303 A.2d 273.
In response to the Robinson litigation, the Legislature passed the Public School Education Act of 1975 (PSEA), N.J.S.A. 18A:7A-1 to -60, which was promptly challenged for facial compliance with the T & E clause and upheld provided it was fully funded. Abbott I, supra, 100 N.J. at 282, 495 A.2d 376 (citing Robinson v. Cahill, 69 N.J. 449, 454, 467, 355 A.2d 129 (1976) (Robinson V)).
Abbott I was a challenge to the PSEA on the grounds that, as funded, it was unconstitutional because there remained excessive financial disparities among the school districts. 100 N.J. at 282, 495 A.2d 376. The Court discussed the potential evidence that would be required to establish an equal protection claim and a T & E claim:
Thus, in litigating the equal protection claim, it is anticipated that the parties will address issues that will overlap substantially with the questions raised by the claim based on the thorough and efficient clause. Both turn on proof that plaintiffs suffer educational inequities and that these inequities derive, in significant part, from the funding provisions of the 1975 Act. The claims may differ, however, in that the thorough and *395 efficient education issues call for proofs that, after comparing the education received by children in property-poor districts to that offered in property-rich districts, it appears that the disadvantaged children will not be able to compete in, and contribute to, the society entered by the relatively advantaged children. The equal protection issues, on the other hand, call for proofs that, even if all children receive a minimally thorough and efficient education, the financing scheme engenders more inequality than is required by any other State interest.
[Id. at 295-96, 495 A.2d 376.]
Plaintiffs rely on this passage in Abbott I to support their contention that the Court has not foreclosed equal protection application in the school funding arena. However, the discussion in Abbott I merely laid out the elements that would be required, respectively, to establish an equal protection or T & E violation. When it came to deciding the issue, after development of a record, the Court in Abbott II decided the case on T & E grounds, again refusing, as in Robinson I, to consider the equal protection claim:
We decline to rule on plaintiffs' state equal protection claim. The core of their argument is that wealth-based disparity is causing educational disparity. They contend, in effect, that what they consider the fundamental right of education is affected by the property wealth of the school district, that the system in reality consists of a classification of students that determines their level of education by a characteristic not only irrational but suspect, the property wealth of the districts they live in, and that there is no compelling State interest to justify the classification. We referred in Robinson I to the monumental governmental upheaval that would result if the equal protection doctrine were held applicable to the financing of education and similarly applied to all governmental services. We need not deal with those implications, for the remedy afforded in this opinion, although not based on equal protection, substantially mitigates plaintiffs' equal protection claim.
[Abbott II, supra, 119 N.J. at 389-90, 575 A.2d 359 (citation omitted).]
A panel of this court also refused to apply equal protection principles to an education funding constitutional claim, "when the last word by our Supreme Court has declared such an inroad to be `unmanageable.'" Stubaus v. Whitman, 339 N.J.Super. 38, 59, 770 A.2d 1222 (App.Div.2001), certif. denied, 171 N.J. 442, 794 A.2d 181 (2002). The panel questioned whether it could "distinguish on a constitutional basis between the delivery of education to our children, even though protected by its own specific constitutional clause, and the delivery of fire and police protection, for example, for all our citizens including our children." Id. at 59, 770 A.2d 1222. The panel therefore expressed its "unease about pronouncing a willingness to decide the claim on an equal protection basis, and... conclude[d] that [it] remain[ed] bound by Robinson I and reject[ed] any attempt to project equal protection into the school funding dispute." Id. at 60, 770 A.2d 1222.
However, another panel of this court did consider the equal protection argument presented by three suburban school districts challenging the approval of charter schools within their districts because they would siphon funds away from the operation of their traditional public schools. In re Grant of Charter Sch. Application, 320 N.J.Super. 174, 237-39, 727 A.2d 15 (App. Div.1999), aff'd as modified, 164 N.J. 316, 753 A.2d 687 (2000). Although the panel found no equal protection violation, it considered the merits of the argument, applying *396 the balancing test applicable to such challenges under the New Jersey Constitution. Ibid. In affirming with some modifications, the Supreme Court said nothing about the panel's consideration and disposition on the merits of the equal protection argument,[4] which might be deemed approval of it.
It is therefore uncertain whether our precedents allow equal protection application in this context. Although plaintiffs attempt to distinguish this situation from those considered in the Robinson and Abbott cases, the same underlying impediment to equal protection analysis exists here as well. Limited state funds are available for funding a thorough and efficient system of education throughout the State. That system stands ready to accommodate all who choose to attend traditional public schools. Additional funds would be needed to provide facilities funding for charter schools. Although providing the additional ten percent for operational expenses would not directly require additional funds, the traditional public schools would suffer a loss in having to cover their overall fixed costs even though some of their students left for charter schools. We will discuss this later in this opinion.
Full funding of charter schools would divert funds from other governmental purposes. This is the very circumstance that impelled the Court to deem equal protection application unmanageable in this area. Although we recognize the uncertainty of equal protection application, we proceed to consider the claim on the merits.

V
The challenged statutes are presumptively valid. In re C.V.S. Pharmacy Wayne, 116 N.J. 490, 497, 561 A.2d 1160 (1989), cert. denied, sub. nom. C.V.S. v. Bd. of Pharmacy, 493 U.S. 1045, 110 S.Ct. 841, 107 L.Ed.2d 836 (1990). "When a state statute is challenged on state constitutional grounds, the nature of state government and the distribution of sovereign power within it make the plaintiff's burden a heavy one." Smith v. Penta, 81 N.J. 65, 74, 405 A.2d 350, appeal dismissed, 444 U.S. 986, 100 S.Ct. 515, 62 L.Ed.2d 416 (1979).
As we have stated, plaintiffs have not alleged in their complaint that they are being deprived of a thorough and efficient education. Indeed, the charter school movement has been developed as a reform measure in the educational system to provide creative and innovative means of providing students with a better education than they receive in traditional public schools. The general assertion in their complaint that the funding disparity "negatively affects" their education states only a conclusory, speculative and hypothetical proposition. Indeed, if plaintiffs could plead in good faith that their education fell below applicable state regulations, guidelines and criteria as required to fulfill the T & E obligation, they presumably would have done so. See In re Charter Sch. Application, supra, 164 N.J. at 331, 753 *397 A.2d 687 (noting that none of the three suburban districts claimed "that the approval of the charter schools in [their districts] will cause [them] to cease providing a thorough and efficient education to [their] remaining pupils").
In assessing a state equal protection claim, we must first identify the nature of the affected right. That right is to receive a thorough and efficient education. Unlike the students involved in the Robinson and Abbott cases, who, by virtue of their residence, were required to attend specific public schools in their district, plaintiffs' enrollment in their charter schools is completely voluntary. They can withdraw at any time and enroll in the traditional public schools in Newark which are receiving the full funding which they seek for their charter schools. See In re 1999-2000 Abbott v. Burke Implementing Regulations, 348 N.J.Super. 382, 441, 792 A.2d 412 (App.Div.2002) (rejecting constitutional challenge to regulations for excluding charter schools from the definition of "Abbott districts" because a charter school is an "optional program ... [and] students may, at any time, exercise the option of withdrawing from the charter school if they wish to benefit from the Abbott remedial measures").
Undoubtedly, the affected right is an important one. See Abbott I, supra, 100 N.J. at 295, 495 A.2d 376. The extent to which the government restriction intrudes upon it is at most very minor, and possibly nonexistent. There are several reasons for this. First, the Legislature has deemed the establishment of charter schools an "educational reform by providing a mechanism for the implementation of a variety of educational approaches which may not be available in the traditional public school classroom." N.J.S.A. 18A:36A-2. To this end, the legislative history makes clear that charter schools are permitted to seek waiver of most board regulations in order to give them maximum control to devise innovative and creative methods of education. See Sponsor Statement to Assembly No. 592, at 3 (Dec. 11, 1995) ("[S]chools are also given the option of seeking waivers of State board regulations in order to provide a stimulus to meet educational objectives in novel and creative ways.... [They] are intended to ... give [teachers] the maximum amount of freedom possible to set educational goals and devise ways to achieve them."); James M. O'Neill, Charter Schools Get Senate Support, The Inquirer (Philadelphia), Dec. 22, 1995, at 15 ("Charter schools would presumably offer education alternatives to parents not satisfied with the education their children receive in their [traditional] public schools."). See also In re Charter Sch. Application, supra, 164 N.J. at 321, 753 A.2d 687 ("Advocates view the charter schools as a way to increase innovation in public schooling, contending that increased activism will promote creativity in management and curricula.").
Thus, the charter school program was a reform measure by the Legislature to ensure that every child receives a thorough and efficient education by providing an innovative alternative to traditional public schools. Having enrolled in charter schools, plaintiffs, unlike traditional public school students, receive an education largely exempt from regulation.
Further, any time plaintiffs or their parents or guardians are dissatisfied with the education plaintiffs are receiving, they are free to give up the benefits conferred on charter schools and enroll in a traditional public school. The voluntariness of the program vitiates any asserted deprivation of a right to receive an education at a school that is fully funded to the same extent as other Newark public schools *398 when charter school students have the unabridged option of attending one of those traditional public schools in their district.
It is also significant that, under the very strict statutory and regulatory provisions applicable to charter schools, they are required to provide at least the level of education, tested by the same standards as traditional public schools, that is designed to provide a thorough and efficient education. If charter schools do not meet that obligation, remedies other than funding remedies are available. The Commissioner is statutorily authorized to place a charter school on probationary status and oversee the implementation of a remedial plan. N.J.S.A. 18A:36A-17. If the remedial plan is unsuccessful, the Commissioner may revoke the charter. Ibid. Indeed, we recognized such an eventuality in Abbott v. Burke Implementing Regulations, supra, 348 N.J.Super. at 441, 792 A.2d 412, holding that there was no constitutional violation in excluding charter schools from the definition of Abbott districts and observing that "unlike Abbott school districts, a charter school will simply cease operating if the Commissioner vacates the charter."
The final step in the balancing test examines the public need for the restriction. Even if there is a slight governmental intrusion on charter school students, there must be some public need justifying the restriction, lest the State action be deemed arbitrary. Lewis, supra, 188 N.J. at 443-44, 908 A.2d 196; Robinson, supra, 62 N.J. at 492, 303 A.2d 273. The justification for the restriction is the public need to reduce the diversion of scarce resources from existing traditional public schools so that the State may continue to provide a thorough and efficient education to all students. Indeed, in the debates prior to enactment of the CSPA, "[t]he most frequently expressed objection was charter schools would divert tax dollars from existing districts without any corresponding decrease in their costs." In re Charter Sch. Application, supra, 320 N.J.Super. at 190, 727 A.2d 15 (referencing three public hearings in 1995 before the Senate and Assembly Education Committees).
The need to conserve scarce resources for traditional public schools was evident when the flip side of this controversy was presented in In re Grant of Charter School Application. Three local boards of education in suburban districts challenged the grant of proposed charter schools in their districts "on the grounds that the charter school would divert scarce funds from the existing school district." Id. at 185, 727 A.2d 15. The boards predicted that the loss of funds from their districts as a result of the ninety percent per pupil funding provision would "cause dire consequences for their respective school districts." 164 N.J. at 331, 753 A.2d 687. The Supreme Court ultimately upheld the grant of the charters, noting that the ninety percent funding provision was added to the legislation "to address concerns raised by various groups at the public hearings about funding." Id. at 332, 753 A.2d 687. The original version of the bill had provided for one hundred percent funding. Ibid. However, a "common theme" of two public hearings held by the Senate Education Committee "was the fear concerning what the loss of one hundred percent of the local levy budget per pupil would mean for the district of residence." Ibid. "In particular, commentors expressed concern about how a district would handle the loss of funds and still cover the fixed costs for the school district." Id. at 332-33, 753 A.2d 687. Accordingly, the Legislature reduced the per pupil amount for charter school students from one hundred percent to ninety percent. Id. at 333, 753 A.2d 687; N.J.S.A. 18A:36A-12. "The evolution of this provision demonstrates that the Legislature *399 responded to concerns about the loss of 100% of per-pupil funding to the charter school." 164 N.J. at 333, 753 A.2d 687.
The decision to fund the charter schools at ninety percent and to prohibit them from receiving state facilities funds was therefore not an arbitrary decision. It was a legislative compromise in response to the "worry that charter schools could siphon off public school funds and eventually undermine public education." Patrick Graham, Assembly OKs Charter School Bill, Courier Post (New Jersey), Jan. 5, 1996, at 4.
As to the absence of facilities funding for charter schools, the State posits that the legislative reason, although not specified in the legislation or its history, is self-evident, namely that traditional public schools are finite and will be in existence long term, whereas charter schools are transitory and may come and go. We find this proposition persuasive.
Thus, contrary to plaintiffs' arguments, the challenged statutes constituted an effort to ensure a thorough and efficient education for all children, not undermine it. Moreover, this method of legislative compromise was well within the State's purview. See Barone v. Dep't of Human Servs., 107 N.J. 355, 370, 526 A.2d 1055 (1987) ("State funds available for public assistance programs are limited. It is the Legislature that has the duty to allocate the resources of the State. As long as the classification chosen by the Legislature rationally advances a legitimate governmental objective, it need not be the wisest, the fairest, or the one we would choose. It is not for the courts to determine if there is a better way to allocate resources under these programs.") (emphasis added).
Quoting Abbott I, supra, 100 N.J. at 296, 495 A.2d 376, plaintiffs argue that even if T & E is not burdened, an equal protection claim can succeed if "plaintiffs suffer educational inequities ... that ... derive, in significant part, from the funding provisions[,] [and] ... even if all children receive a minimally thorough and efficient education, the financing scheme engenders more inequality than is required by any other State interest." We find this argument unpersuasive. Plaintiffs have not alleged that they suffer "educational inequities." Therefore, a necessary element of their claim is simply absent. The allegation in their complaint that the disparity in funding "negatively affects" their education is insufficient to meet this element. First, it is conclusory, vague and speculative. Second, it assumes the absence of any federal funding or receipt of any gifts or donations, which are contemplated and authorized by the CSPA. Third, there is no actual T & E deficiency and the "negatively affects" allegation refers only to the fact of less than full funding, not that it will cause the charter schools "to cease providing a thorough and efficient education." In re Charter Sch. Application, supra, 164 N.J. at 331, 753 A.2d 687. Finally, if there were a T & E deficiency, other remedies are available or, of course, plaintiffs could return to a traditional public school.
Plaintiffs further argue that the denial of all facilities funding constitutes a "categorical denial of a government service to a discrete group, despite the fact that the service is provided to other similarly situated persons [i.e. traditional public school students]." As we have stated, the funding provisions were a reasoned compromise intended to advance ensuring a thorough and efficient education for all public school students. We do not view this legislative decision as a "categorical denial of a government service" to any group.
The equal protection provision in the New Jersey Constitution "prohibits the *400 State from adopting statutory classifications that treat similarly situated people differently." Stubaus, supra, 339 N.J.Super. at 57, 770 A.2d 1222 (citing Sanchez v. Dep't of Human Servs., 314 N.J.Super. 11, 30, 713 A.2d 1056 (App.Div.1998)). Plaintiffs do not fall within this prohibition. Because their enrollment in a charter school is voluntary and optional, thus giving them a choice to attend a traditional public school, they are either not "similarly situated" to other Newark children who attend traditional public schools, or they are not treated "differently" than them because plaintiffs too can attend the same traditional public schools.
Throughout the Robinson and Abbott decisions, it is clear that the constitutional T & E mandate requires an equal educational "opportunity." Plaintiffs allegation of inequality between Newark charter schools and Newark traditional public schools is based solely upon the disparity in funding. Plaintiffs fail to demonstrate how they are deprived of the equal opportunity to attend the fully funded traditional public schools available to them in their city.
As we stated in In re Charter School Application, supra, 320 N.J.Super. at 239, 727 A.2d 15, application of the New Jersey equal protection balancing test leads to the conclusion "that the two categories created by the [CSPA] are reasonably designed to further the appropriate governmental intent of `promoting comprehensive education reform by providing a mechanism for the implementation of a variety of education approaches which may not be available in the traditional public school classroom.' N.J.S.A. 18A:36A-2." We are unconvinced that plaintiffs have demonstrated that the classifications intrude upon their right to equal access to a thorough and efficient education.
The procedural posture in which this case comes to us is from the granting of the State's motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 4:6-2(e). Such motions should be granted "in only the rarest of instances" and after meticulous and indulgent examination of the complaint. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 772, 563 A.2d 31 (1989). "Where, however, it is clear that the complaint states no basis for relief and that discovery would not provide one, dismissal of the complaint is appropriate." County of Warren v. State, 409 N.J.Super. 495, 503, 978 A.2d 312 (App. Div.2009), certif. denied, 201 N.J. 153, 988 A.2d 1176, cert. denied, sub. nom. Shope v. N.J., ___ U.S. ___, 130 S.Ct. 3508, ___ L.Ed.2d ___ (2010). If dismissal is warranted, it should usually be without prejudice. Printing Mart-Morristown, supra, 116 N.J. at 772, 563 A.2d 31. However, when an equal protection challenge fails to state a claim, our courts have not hesitated to dismiss the complaint with prejudice. See, e.g., Sojourner A. v. N.J. Dep't of Human Servs., 177 N.J. 318, 324, 828 A.2d 306 (2003); Felicioni v. Admin. Office of Courts, 404 N.J.Super. 382, 391, 961 A.2d 1207 (App.Div.2008); Stubaus, supra, 339 N.J.Super. at 63, 770 A.2d 1222. Appellate review of the grant of a motion to dismiss is de novo. County of Warren, supra, 409 N.J.Super. at 504, 978 A.2d 312.
We reject plaintiffs' contention that, if their complaint is to be dismissed, the dismissal should be without prejudice. For the reasons we have stated, we are satisfied that dismissal with prejudice is appropriate in this case. Plaintiffs' arguments and the matters they wish to develop through discovery are better suited for presentation to the Legislature. The funding scheme that is now in place represents a deliberate and deliberative legislative design intended as a reform measure *401 to enhance public education for all students in traditional public schools and charter schools. Because we find no equal protection violation, and because plaintiffs have not even alleged a T & E violation, we find no occasion for judicial interference with the legislative will.
Affirmed.
NOTES
[1] In their initial complaint, plaintiffs also alleged they were denied equal protection because their charter schools did not receive Abbott funding in the nature of supplemental and parity aid, pursuant to N.J.A.C. 6A:10A-1.2, a Department of Education regulation which categorically denied such aid to charter schools. However, with the passage during the pendency of this appeal of the School Funding Reform Act of 2008 (SFRA), 18A:7F-43 to -63, the constitutionality of which was upheld by the Supreme Court in Abbott v. Burke, 199 N.J. 140, 175, 971 A.2d 989 (2009) (Abbott XX), that contention is moot, and plaintiffs have so conceded. Under the SFRA, former Abbott districts no longer receive supplemental and parity aid.
[2] The complaint also sought a declaration that N.J.A.C. 6A:10A-1.2 (excluding charter schools from Abbott funding) also denied equal protection, but that claim is now moot.
[3] In this opinion, we have described the ninety percent funding level in general terms, which is sufficient for our analysis of the issues before us. More specifically, this aspect of charter school funding is set forth in N.J.S.A. 18A:36A-12(b) and (d) as follows:

b. The school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the district an amount equal to 90% of the sum of the budget year equalization aid per pupil and the prebudget year general fund tax levy per pupil inflated by the CPI rate most recent to the calculation. In addition, the school district of residence shall pay directly to the charter school the security categorical aid attributable to the student and a percentage of the district's special education categorical aid equal to the percentage of the district's special education students enrolled in the charter school and, if applicable, 100% of preschool education aid. The district of residence shall also pay directly to the charter school any federal funds attributable to the student.
. . . .
d. Notwithstanding the provisions of subsection b. of this section, in the case of a student who was not included in the district's projected resident enrollment for the school year, the State shall pay 100% of the amount required pursuant to subsection b. of this section for the first year of the student's enrollment in the charter school.
[4] The Court noted that the districts challenged the CSPA as unconstitutional "because it violates equal protection and due process, contravenes the prohibition against the donation of public funds for private purposes, and constitutes an improper delegation of legislative power to a private body." In re Charter Sch. Application, supra, 164 N.J. at 319, 753 A.2d 687. The Court then said that Judge King "comprehensively addressed" all of the challenges in the Appellate Division opinion, which the Court affirmed, "modifying only its articulation of the Commissioner of Education's responsibilities when reviewing the financial and racial impacts that approval of a charter school will have on a public school district." Ibid. (emphasis added).